Matthew T. Christensen, ISB: 7213
ANGSTMAN JOHNSON
199 N. Capitol Blvd., Ste 200
Boise, ID 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@angstman.com

Attorney for Defendants

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>RINALDO AND MAILE HUNT,<br><br>Debtors.<br>_____<br><br>ALISHA LIN, an individual and DENNIS LIN, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>RINALDO HUNT, an individual and MAILE HUNT, an individual,<br><br>Defendants. | Bankr. Case No.: 20-00137-JDP<br><br><br><br><br><br>Adv. Case No. 20-06015-JDP<br><br><br>DECLARATION OF MATTHEW T. CHRISTENSEN |

Pursuant to 28 U.S.C. §1746, the undersigned submits the following Declaration, signed under penalty of perjury, in support of the Renewed Motion for Summary Judgment submitted by the Defendants in this adversary proceeding.

1. My name is Matt Christensen, I am of sufficient age and competency to testify to the matters stated herein of which I have personal knowledge.

DECLARATION OF MATTHEW T. CHRISTENSEN – Page 1

2.      I am an attorney representing the Debtors in the Bankruptcy case and the Defendants in this Adversary Proceeding.

3.      On December 2, 2020, I served a copy of Defendants discovery requests, including Requests for Admission, to the Plaintiffs in this adversary case.  Attached as ***Exhibit A*** is a copy of my email serving the requests.  Attached as ***Exhibit B*** is a copy of the actual discovery requests themselves.

4.      Responses to the discovery requests were due on or before January 4, 2021.  As of the date of this Declaration, no responses to those discovery requests have been provided by the Plaintiffs, and no extensions of time to respond have been requested or granted.  Pursuant to Rule 36(a)(3) and 36(b) (both incorporated herein by Fed. R. Bankr. Proc. 7036)), all of the Requests for Admission are admitted and the matters described therein are conclusively established.

5.      On January 12, 2021, a deposition of Rinaldo Hunt was taken.  Attached as ***Exhibit C*** is a copy of the transcript of the Rinaldo Hunt deposition.

6.      On January 19, 2021, a deposition of Dennis Lin was taken.  Attached as ***Exhibit D*** is a copy of the transcript of the Dennis Lin deposition.

7.      I declare under penalty of perjury that the foregoing is true and correct.


DATED this 3rd day of March, 2021.


_____/s/ Matt Christensen_____
MATTHEW T. CHRISTENSEN


DECLARATION OF MATTHEW T. CHRISTENSEN – Page 2

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of March, 2021, I filed the foregoing
DECLARATION electronically through the CM/ECF system, which caused the following parties
to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Matthew T. Christensen | mtc@angstman.com |
| Joseph M. Wager | wager@mwsslawyers.com |

Any others as listed on the Court's ECF Notice.


/s/ Matt Christensen
Matthew T. Christensen

DECLARATION OF MATTHEW T. CHRISTENSEN – Page 3

# EXHIBIT A

**Matthew Christensen**

| | |
|---|---|
| **From:** | Matthew Christensen |
| **Sent:** | Wednesday, December 2, 2020 9:16 AM |
| **To:** | Sean Egan; Joe Wager |
| **Cc:** | Megan Richmond |
| **Subject:** | RE: Depositions |
| **Attachments:** | Hunt Intial Discovery Requests.pdf; Hunt Intial Discovery Requests.docx |

Sean/Joe,

Sorry for my tardy reply – I spent most of November recovering from COVID.

Attached are my clients' discovery requests to your clients. I've included a Word version as well as the pdf copy.

I'm working with Rinaldo on the deposition dates later this month. Hope to have something nailed down by the end of today. Are you okay doing it via Zoom?

I would also like to get the deposition of Dennis Lin scheduled (also via Zoom). However, I'd like to get the discovery responses back first. I have mediation and a trial the first week of January. Can you let me know if either January 11 or 12 would work for that deposition?

Thanks!

MTC

---

**From:** Sean Egan <seannegan@sneganlaw.com>
**Sent:** Monday, November 30, 2020 4:17 PM
**To:** Matthew Christensen <mtc@angstman.com>
**Subject:** Fw: Depositions

Matt

Any update on this?

----- Forwarded Message -----
**From:** Sean Egan <seannegan@sneganlaw.com>
**To:** Matthew Christensen <mtc@angstman.com>
**Cc:** Joe Wager <wager@mwsslawyers.com>
**Sent:** Wednesday, November 18, 2020, 8:08:07 AM MST
**Subject:** Re: Depositions

Matt

I apologize for the delay in getting back to you on dates. My early December is jammed up. I was hoping for the week of the 14th or 21st. I'd like to come up to Boise but given the availability of flights and so forth, it may not be possible. Can you give me some dates in those two weeks? Thanks.

Sean


On Tuesday, October 27, 2020, 3:06:46 PM MDT, Matthew Christensen <mtc@angstman.com> wrote:


Sean,


How does Dec 3rd look?  That day would be easier to both Rinaldo and I.  We don't necessarily need to do it in person – I've done several  Zoom depositions and those seem to work well.  Let me know what you prefer.


MTC

---

**From:** Sean Egan <seannegan@sneganlaw.com>
**Sent:** Wednesday, October 21, 2020 4:13 PM
**To:** Matthew Christensen <mtc@angstman.com>
**Cc:** Joe Wager <wager@mwsslawyers.com>
**Subject:** Depositions


Matt


Well done today.


I'd like to get some dates from you for Rinaldo's deposition in early December. I want to make sure I get documents and any disputes are ironed out first and my November is already pretty dreadful. How does December 4 look? I am willing to come to Boise to get it done. Please let me know. Thanks.


Sean

# EXHIBIT B

Matthew T. Christensen, ISB: 7213
ANGSTMAN JOHNSON
199 N. Capitol Blvd., Ste. 200
Boise, Idaho 83702
Telephone: (208) 384-8588
Facsimile:  (208) 629-2157
Email:  mtc@angstman.com

*Attorney for Defendants Rinaldo Hunt,*
*and Maile Hunt*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>RINALDO E. HUNT and MAILE N. HUNT,<br><br>    Debtors.<br>_____ | Bankr. Case No.: 20-00137-TLM |
| ALISHA LIN, an individual and DENNIS LIN, an individual,<br><br>    Plaintiffs,<br><br>vs.<br><br>RINALDO HUNT, an individual and MAILE HUNT, an individual,<br><br>    Defendants. | **Adv. Case No. 20-06015-TLM**<br><br>**DEFENDANTS' DISCOVERY REQUESTS TO PLAINTIFFS** |

TO: Plaintiffs, Alisha Lin and Dennis Lin, and their counsel of record:

  YOU WILL PLEASE TAKE NOTICE that the Defendants herein, pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure (F.R.C.P.) (incorporated herein by the Federal Rules of Bankruptcy Procedure), require the Plaintiffs to answer the following Interrogatories, Requests for Production of Documents, and Requests for Admission within thirty (30) days of the service of these discovery requests.

**DEFENDANTS' DISCOVERY REQUESTS TO PLAINTIFFS– PAGE 1**
A♦J; Matter: 12504-004

## INSTRUCTIONS AND PRELIMINARY STATEMENT

1.      **SIGNING OF ANSWERS AND RESPONSES**.  Pursuant to Rule 33(a)(2), F.R.C.P., the answers to these Interrogatories shall be signed by the person making them and any objections thereto shall be signed by counsel for Plaintiffs, if any.  Pursuant to Rule 36(a), F.R.C.P., a written answer or objection must be provided and signed under oath by the party or the party's attorney, within thirty (30) days.  Failure to answer or object will result in each matter being admitted.

2.      **WRITTEN RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS**.  Pursuant to Rule 34(b) F.R.C.P. you are required to file a written response including any objections within thirty (30) days of your receipt of these Requests for Production.  If an objection is made it shall be stated in writing as to each item, category or part thereof.

3.      **TIME AND PLACE FOR PRODUCTION**.  You are requested to produce for inspection each of the following listed documents or things or in the alternative, provide true and accurate copies of the same to the office of ANGSTMAN JOHNSON, 199 N. Capitol Blvd., Ste. 200 Boise, ID 83702, within thirty (30) days of the service of these discovery requests.

4.      **FURNISHING ALL AVAILABLE INFORMATION AND MATERIALS.**  When responding to the following Interrogatories and Requests, you are requested to furnish all information available to you, including information and documents in the possession of your attorneys, investigators, employees, officers, directors, agents, representatives or any other person or persons acting on your behalf.

5.      **PARTIAL ANSWERS OR RESPONSES**.  If you cannot answer any of the Interrogatories in full or produce all requested documents and things after exercising due

diligence to secure the information to do so, so state, and answer and respond to the extent possible, specifying your inability to answer the remainder, or provide all requested documents and things and stating whatever information or knowledge you have concerning the unanswered portions or remaining documents.

6.    **OBJECTIONS AND PRIVILEGES**.  If any information, document or portion thereof that is responsive to any Request or Interrogatory herein is or will be withheld from production, inspection, copying or answering (whether because it is claimed to be work product, communication from attorney to client, or is entitled to be withheld for any other reason), please fully identify such document or portion thereof in your response and fully state in your response the reason it is or will be withheld.  In addition, if any document is practically impossible of production, inspection and copying, please fully identify such document and the reason for the practical impossibility.

7.    **DUTIES OF SUPPLEMENTATION**.  All discovery herein is deemed continuing.  If, after responding to these Requests and Interrogatories, the Plaintiff acquires any documents requested herein, or any information related to any Interrogatory or document herein, which is not reflected by any documents produced or any response to these Requests or the original Answers to Interrogatories, you must file a Supplemental Response or Answer or provide written notice to counsel for Defendants of the existence of such documents or information. Such supplementation is requested herein in addition to any supplementation required by the Federal Rules of Civil Procedure.

## DEFINITIONS

1.    The term "identify" when referring to an individual, corporation or other entity, shall mean to set forth:

(a)     The name.

(b)     Present or last known business and residence address and telephone number.

(c)     If a corporation, the principal place of business and telephone number.

(d)     If an individual, his or her present employer and his or her job title both presently and at all times referred to in the specific Interrogatory.

2.      The term "identify" when referring to a document (as herein defined), shall mean to set forth the author or originator, addressee(s), date, title or subject matter, and the present custodian of the original thereof, or, if unknown, the present custodian of any copy thereof, and the last known address of each such custodian.

3.      The term "including" means without limitation of the generality of the term preceding the word "including" to which the word "including" refers.

4.      The term "document" as used in these Interrogatories and Requests shall mean and include any and all:

(a)     Tangible things or items, whether handwritten, typed, printed, tape recorded, electronically recorded, videotape recorded, visually reproduced, stenographically reproduced, computer generated or reproduced in any other manner;

(b)     Originals and all copies of any and all communications;

(c)     Writings of any kind or type whatsoever;

(d)     Books and pamphlets;

(e)     Microtape, microfilm, photographs, movies, records, recordings, tape recordings, and videotape recordings, stenographically or otherwise reproduced;

(f)     Diaries and appointment books;

(g)     Cables, wires, memoranda, reports, notes, minutes, and interoffice communications;

(h)     Letters and correspondence;

(i)     Drawings, blueprints, sketches, maps, and charts;

(j)     Contracts or agreements;

(k)     Other legal instruments or official documents;

(l)     Published material of any kind;

(m)     Vouchers, receipts, invoices, bills, orders, billings, and checks;

(n)     Investigation or incident reports;

(o)     Files and records;

(p)     Notes or summaries of conferences, meetings, discussions, interviews or telephone conversations or messages;

(q)     Computer disks, memories, e-mail or any other computer-generated data; and

(r)     Drafts or draft copies of any of the above.

5.      The term "you" and "your" means the Plaintiff(s) and all or any agents, representatives, employees, attorneys, parent and subsidiary companies, and every person acting or purporting to act, or who has ever acted or purported to act, on behalf of said Plaintiff(s);

"you" means also the person or persons answering these Interrogatories and Requests, and "your" refers to the same persons to which "you" refers.

6.      "Tangible things" means any object, property or thing of a corporeal nature that is not otherwise subsumed and included under the term "documents" as hereinabove defined.

7.      "Persons" means and includes any natural person, partnership, corporation, joint venture, unincorporated association, governmental entity (or agency or board thereof), quasi-public entity or other form of entity, and any combinations thereof.

8.      "All" means "any and all."

9.      "And" includes "or" and "and/or."

10.     "Facts" mean all circumstances, events, and evidence pertaining to or touching upon the item in question.

11.     "Communicate" or "communication" refers to every manner or means of disclosure or transfer or exchange of information, whether orally or by document and whether face-to-face, by telephone, mail, personal delivery, e-mail or otherwise.

12.     "Evidencing" or "relating to" means consisting of, summarizing, describing, mentioning or referring to.

13.     Whenever the plural appears, the word shall include the singular, and vice versa.

14.     Masculine pronouns shall not connote any particular gender but shall be taken to mean masculine, feminine or neuter gender, as the appropriate case may be.

15.     All requests for documents assume that the documents are either in your possession or control as the term "you" and "your" is defined.

16.     The term "pleading," unless otherwise noted, shall mean and refer to Plaintiffs' Complaint or any amended complaints and Defendants' Answer(s).

17.     The term "Hunt" refers to the Defendant, Rinaldo Hunt.

18.     The term "Maile Hunt" refers to the Defendant, Maile Hunt.

19.     The term "Lin" refers to the Plaintiffs, Alisha Lin, or Dennis Lin, or both, depending on the context.

20.     The term "Complaint" refers to the Plaintiffs' Amended Complaint for Non-Dischargeability of Debts (Docket No. 20).

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**  Please identify, as defined above, all persons who have knowledge that significantly bears on any of the claims in the pleadings or on any defense that is raised in this action.

**INTERROGATORY NO. 2:**  For each individual identified in response to Interrogatory No.1, please state briefly what knowledge you believe that person to have that bears upon any of the claims in the pleadings or on any defenses that will be raised in this action.

**INTERROGATORY NO. 3:**  Please identify any and all documents, which relate to Plaintiffs' claims asserted in this matter.

**INTERROGATORY NO. 4:**  Please identify any and all documents that you intend to use as exhibits at trial of this case.

**INTERROGATORY NO. 5:**  Have Plaintiffs, any attorneys or any person, firm, corporation or government entity acting on their behalf, consulted with or engaged any experts who are expected to testify in connection with this litigation?  If so, please state for each such expert:

          a.      The name, current address and telephone number of such person;

**DEFENDANTS' DISCOVERY REQUESTS TO PLAINTIFFS– PAGE 7**
A♦J; Matter: 12504-004

b.      A complete statement of all opinions to be expressed and the basis and reasons thereof;

c.      The data or other information relied upon by the expert in forming such opinions;

d.      Identify any documents or things to be used as exhibits at trial in support of such opinions;

e.      The qualifications of the expert;

f.      A list of all publications authored by the expert in the preceding ten (10) years;

g.      A list of any other cases in which the expert has testified as an expert witness at trial or in deposition within the preceding four (4) years, including the name of each case, the court in which it was litigated, the applicable case number and the dates of any trial or deposition testimony;

h.      Whether the expert has prepared a written report or other document concerning his or her opinions pertaining to this case; and

i.      The compensation to be paid for the testimony.

**INTERROGATORY NO. 6:**  Please identify each and every fact or document which supports the allegations contained in paragraph 7 of the Complaint, which states: "Hunt requested that Lin loan him approximately $130,000 as bridge financing," and that "Hunt represented that he would return Lins' money within 60 days after closing."

**INTERROGATORY NO. 7:**  Please identify each and every fact or document which supports the allegations contained in paragraph 9 of the Complaint.

**INTERROGATORY NO. 8:** Please identify each and every fact or document which supports your allegations contained in paragraph 11 of the Complaint, including why any reliance by Lin on any statements by Hunt was justified.

**INTERROGATORY NO. 9:** Please identify each and every fact or document which supports your allegations contained in paragraph 13 of the Complaint, including (but not necessarily limited to) specifically the following allegations: (a) that statements made by Hunt were false or misleading; (b) that Hunt made any statements or omission with the intent to deceive Lin.

**INTERROGATORY NO. 10:** Please specifically and separately identify <u>any and all</u> statements allegedly made by Hunt which support your 11 U.S.C. §523(a)(2)(A) claim.

**INTERROGATORY NO. 11:**      Please specifically and separately identify <u>any and all</u> statements allegedly made by Hunt which support your 11 U.S.C. §523(a)(2)(B) claim.

**INTERROGATORY NO. 12:**      Please specifically and separately identify <u>any and all</u> statements allegedly made by Maile Hunt which support <u>either</u> your 11 U.S.C. §523(a)(2)(A) or §523(a)(2)(B) claims.

**INTERROGATORY NO. 13:**      Please identify all facts or documents which support your allegation that any statements made by Hunt or Maile Hunt were materially false.

**INTERROGATORY NO. 14:**      Please identify all facts or documents which support your allegation that any statements made by Hunt or Maile Hunt were made or published with the intent to deceive Lin.

**INTERROGATORY NO. 15:**      If you deny any of the Request for Admission included herein, please identify (a) the inquiry or investigation you performed prior to denying the Request for Admission, (b) any reasonable ground to believe that you may prevail on the

**DEFENDANTS' DISCOVERY REQUESTS TO PLAINTIFFS– PAGE 9**
A◆J; Matter: 12504-004

subject matter of the specific Request for Admission, (c) any other good reason for failing to admit the specific Request for Admission, and (d) your basis for denying the specific Request for Admission.

## **REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 1:**  Please produce a true and correct copy of all documents, photographs, tangible objects or things identified or described in your Answer to any Interrogatory.

**REQUEST FOR PRODUCTION NO. 2:**  For each expert listed in Interrogatory No. 5 above, please produce:

        a.      A copy of the expert's curriculum vitae, resume or other similar document reflecting such expert's education, training and experience;

        b.      Any and all written reports of the expert;

        c.      Any and all exhibits to be used as a summary of or support for the expert; and

        d.      All documents submitted to or received by the expert.

**REQUEST FOR PRODUCTION NO. 3:**  Please produce a copy of any and all documents or tangible things you intend to use as an exhibit at the trial in this matter.

**REQUEST FOR PRODUCTION NO. 4:**  Please produce a copy of any and all written communications you had with Hunt or Maile Hunt from January 2017 – present.

**REQUEST FOR PRODUCTION NO. 5:**  Please produce a copy of any written statements you believe Hunt or Maile Hunt made which support the claims asserted in your Complaint.  In your response, please identify which statements were made by Hunt, and which statements were made by Maile Hunt.

**REQUEST FOR PRODUCTION NO. 6:**  Please produce a copy of any statement, written or oral, you assert any party has made regarding the facts alleged in your Complaint.

**REQUEST FOR PRODUCTION NO. 7:**  Please produce a copy of any document you rely upon in denying any Requests for Admission sent by the Defendants.

### REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**    Please admit that, in the underlying Utah state court case (Weber County Case No. 18-0905043 – the "Utah Case"), you did not pursue or prevail on a fraud or misrepresentation claim.

**REQUEST FOR ADMISSION NO. 2:**    Please admit that the judgment obtained in the Utah case was based on a breach of contract claim.

**REQUEST FOR ADMISSION NO. 3:**    Please admit that the judgment obtained in the Utah case was appealed to the Utah Supreme Court and later stayed by the filing of the Hunts bankruptcy case in the District of Idaho.

**REQUEST FOR ADMISSION NO. 4:**    Please admit that Hunt's alleged statement regarding the balance of funds in his bank account at the time of the loan from the Lins was a truthful statement.

**REQUEST FOR ADMISSION NO. 5:**    Please admit that Hunt's alleged statement regarding pending real estate deals which could be used to repay the loan from the Lins was a truthful statement.

**REQUEST FOR ADMISSION NO. 6:**    Please admit that there were no terms included in, or attached to, the loan from the Lins that required the loan funds be used in any specific manner.

**DEFENDANTS' DISCOVERY REQUESTS TO PLAINTIFFS– PAGE 11**
A◆J; Matter: 12504-004

**REQUEST FOR ADMISSION NO. 7:**    Please admit that there was no interest accruing on the loan from Lins to Hunt.

**REQUEST FOR ADMISSION NO. 8:**    Please admit that there was no specific repayment date by which Hunt was required to repay the funds to the Lins.

**REQUEST FOR ADMISSION NO. 9:**    Please admit that the Lins were the first party to use the word "optics" in an oral conversation related to the loan from Lins to Hunt.

**REQUEST FOR ADMISSION NO. 10:**    Please admit that there is no written promissory note documenting the loan from Lins to Hunt.

**REQUEST FOR ADMISSION NO. 11:**    Please admit the Lins did not require any sort of written financial statement from Hunt prior to making the loan.

**REQUEST FOR ADMISSION NO. 12:**    Please admit that the Lins did not inquire about Hunt's previous financial history prior to making the loan.

**REQUEST FOR ADMISSION NO. 13:**    Please admit that Hunt did not have any duty or obligation to inform Lins about his prior bankruptcy filing prior to the Lins making the loan.

**REQUEST FOR ADMISSION NO. 14:**    Please admit that all statements supporting your nondischargeability claims were statements related to Hunt's or Maile Hunt's financial condition.

**REQUEST FOR ADMISSION NO. 15:**    Please admit that the only pre-loan statements by Hunt that support your nondischargeability claims were statements related to (a) Hunt's bank account balance at the time of the loan and (b) Hunt's future ability to repay the loan (through real estate deals that were "in the works" at the time).  In the event you deny this request, please specifically identify any other pre-loan statements which support your nondischargeability claims.

**DEFENDANTS' DISCOVERY REQUESTS TO PLAINTIFFS– PAGE 12**
A❖J; Matter: 12504-004

**REQUEST FOR ADMISSION NO. 16:**   Please admit that there was no "extension, renewal or refinancing" of the loan made by the Lins to Hunt.

**REQUEST FOR ADMISSION NO. 17:**   Please admit that there were no discussions or statements made by Hunt in relation to any "extension, renewal or refinancing" of the loan from the Lins.

**REQUEST FOR ADMISSION NO. 18:**   Please admit that any statements by Hunt relating to the value of personal property taken by Lins or a supersedes bond in the Utah Case were statements made after the loan from Lins was already made.

DATED this 2nd day of December, 2020.

/s/ Matt Christensen
MATTHEW T. CHRISTENSEN
Attorney for Defendants

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 2nd day of December, 2020, I served the foregoing DEFENDANT'S DISCOVERY REQUESTS TO PLAINTIFFS via email, and addressed to those parties below:

| | |
|---|---|
| Joseph M. Wager | wager@mwsslawyers.com |
| Sean Egan | seannegan@sneganlaw.com |

/s/ Matt Christensen
_____
Matthew T. Christensen

# EXHIBIT C

LIN

vs

HUNT


RINALDO HUNT

January 12, 2021



333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

1

```
                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF IDAHO


IN RE:                          )
                                )
RINALDO AND MAILE HUNT,         )
                                )   CASE NO. 20-00137
              Debtors.          )
_____  )
                                )   REMOTE VIDEOCONFERENCE
ALISHA LIN, an individual and   )   DEPOSITION OF:
DENNIS LIN, an individual,      )   RINALDO HUNT
                                )

              Plaintiffs,       )
                                )
        -vs-                    )
                                )
RINALDO HUNT, an individual     )
and MAILE HUNT, an individual,  )
                                )
              Defendants.        )
_____  )
```

COPY

* * *

January 12, 2021
10:00 a.m. to 12:55 p.m.

* * *

Toni Bertini
Certified Shorthand Reporter
Registered Professional Reporter

Case 20-06015-JDP   Doc 38-4   Filed 03/03/21   Entered 03/03/21 15:27:40   Desc
Declaration of Matthew T. Christensen   Page 25 of 59

LIN vs HUNT
Rinaldo Hunt

January 12, 2021



**Page 2**

```
1              A-P-P-E-A-R-A-N-C-E-S
2    FOR THE PLAINTIFFS:
3        LAW OFFICE OF
         SEAN N. EGAN
4        BY:  SEAN N. EGAN
         Attorney at Law
5        136 East South Temple
         Suite 1505
6        Salt Lake City, Utah  84111
         (801) 363-5181
7        seannegan@sneganlaw.com
8    FOR THE DEFENDANTS:
9        ANGSTMAN JOHNSON
         BY:  MATTHEW T. CHRISTENSEN
10       Attorney at Law
         199 North Capitol Boulevard
11       Suite 200
         Boise, Idaho  83702
12       (208) 384-8588
         mtc@angstman.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                I-N-D-E-X
2    EXAMINATION                              PAGE
3    By Mr. Egan                                 4
4
5             E-X-H-I-B-I-T-S
6                                              PAGE
     PLAINTIFFS'                          INTRODUCED
7
        1    Bates stamp DEF 1-22            13
8
        2    Bates stamp DEF 23-49          21
9
        3    Purchase and Sale Agreement    27
10
        4    Bates stamp LIN 1-21           31
11
        5    Uniform Residential Loan Application   47
12
        6    U.S. Bank statement            63
13
        7    Uniform Residential Loan Application   65
14
        8    Bates stamp DEF 50-87          68
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                P-R-O-C-E-E-D-I-N-G-S
2
3            RINALDO HUNT,
4    called as a witness by and on behalf of the Plaintiffs,
5    being duly sworn, was examined and testified as follows:
6
7                EXAMINATION
8
9    BY MR. EGAN:
10       Q   Let the record reflect that this is the time
11   and place by notice and stipulation for the deposition
12   of Rinaldo Hunt in the adversary proceeding of Dennis
13   and Alisha Lin versus Rinaldo and Maile Hunt.
14       Mr. Hunt, we just met off the record.  My name
15   is Sean Egan and I represent the Lins in this matter.
16   My first question is have you ever had your deposition
17   taken before?
18       A   Yes.
19       Q   I imagine you're familiar with the process,
20   but I'd like to go over a few ground rules just so you
21   and I are on the same page.
22       It often happens in normal communication that
23   people will shrug and grunt and communicate
24   non-verbally.  But because we're taking down your
25   testimony, I'm going to ask that you give me audible,
```

**Page 5**

```
1    verbal responses to my questions.  I may even prompt
2    you.  It's not to be rude.  It's just to make sure that
3    we get an actual word in response to a question.  Is
4    that fair?
5        A   Yes.
6        Q   It's likely to happen that I will ask a
7    question that doesn't make any sense.  When that happens
8    please let me know and I'll do my best to rephrase the
9    question so that it's understandable.  If you do
10   understand the question, however, I'm going to assume
11   that you understood it.  Is that fair?
12       A   Yes.
13       Q   It happens a lot in normal communications as
14   well that people will cut each other off.  I'm going to
15   ask that you wait until I complete my question before
16   you answer and I will try my hardest to make sure you
17   finish your answer before I move on to the next
18   question.  Is that fair?
19       A   Yes.
20       Q   I don't know how long this will take,
21   Mr. Hunt.  Hopefully not too long, but if you need a
22   break for any reason that's fine.  Just let me know.  My
23   only request is that you not take a break while a
24   question is pending.  Is that fair?
25       A   Yes.
```

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 26 of 59

January 12, 2021

LIN vs HUNT
Rinaldo Hunt



**6**

1    Q    Okay.  Mr. Hunt, could you please state for
2    the record your full name and address?
3        A    Rinaldo Elliott Hunt, 3812 South Mill Site
4    Lane, Boise, Idaho, 82706.
5        Q    Can you walk me through a thumbnail sketch of
6    your educational background?
7        A    Grade school, high school and attended a
8    four-year college in California.
9        Q    When did you graduate from high school?
10       A    1996.
11       Q    What college did you graduate from?
12       A    California State University at Long Beach.
13       Q    What did you major in?
14       A    Business marketing.
15       Q    Can you walk me through your work history from
16   the time you graduated from college to the present,
17   please?
18       A    Brokerage opportunities at a few firms, worked
19   for a bank part time for a year or so, and then I was
20   self-employed from about 2004 up until 2020.
21       Q    When you say brokerage opportunities what do
22   you mean?
23       A    Working for brokerage houses, brokerage
24   businesses in Los Angeles County.
25       Q    Do you mean real estate brokerage or

**7**

1    securities brokerage?
2        A    Real estate.
3        Q    What is your current occupation?
4        A    Business development.
5        Q    For whom?
6        A    For a local construction company.
7        Q    What's the name of that company?
8        A    Why is that relevant?
9        Q    Because I'm asking you, sir.
10       MR. CHRISTENSEN:  I'll object for the record on
11   relevance.  I don't know what his current employment has
12   to do with the case.
13       MR. EGAN:  I'm just trying to get to know the
14   guy.
15   BY MR. EGAN:
16       Q    Who's your current employer?
17       A    ESI Construction.
18       Q    What do you do for them?
19       A    Business development.
20       Q    Mr. Hunt, can you tell me what you did to
21   prepare for today?
22       A    Nothing.
23       Q    Did you look at any documents?
24       A    No.
25       Q    Did you meet with the Mr. Christensen?

**8**

1        A    I met with Matt once.
2        Q    How long did you meet with him?
3        A    Approximately half an hour.
4        Q    When was that?
5        A    Yesterday.
6        Q    Did you talk to anybody else in preparation
7    for your testimony today?
8        A    No.
9        Q    You indicated a moment ago that you'd been
10   deposed before.  Did I hear that correctly?
11       A    Yes.
12       Q    How many times have you been deposed?
13       A    Once.
14       Q    What was that case?
15       A    It was a real estate matter.
16       Q    Were you a party?
17       A    Yes.
18       Q    What was the name of the case?
19       A    I can't recall.
20       Q    Were you the defendant?
21       A    I can't recall.
22       Q    Do you recall where the case took place?
23       A    California.
24       Q    Do you know where in California?
25       A    Los Angeles County.

**9**

1        Q    Do you remember who represented you?
2        A    I can't recall.
3        Q    How many years ago was it?
4        A    Approximately 16.
5        Q    So approximately 2004 or so?
6        A    Correct.
7        Q    Did you give testimony in your previous
8    bankruptcy?
9        A    I did.
10       Q    To whom did you give testimony?
11       A    I think it was the trustee.
12       Q    Any other testifying experience?
13       A    Not that I can recall.
14       Q    Do you have any other litigation experience?
15       MR. CHRISTENSEN:  Object to the form.
16   BY MR. EGAN:
17       Q    Have you ever been a party in any other
18   litigation?
19       A    Not that I recall.
20       Q    Have you ever been a witness in any other
21   litigation?
22       A    Not that I recall.
23       Q    Okay.  I mentioned a moment ago that you have
24   previously filed for bankruptcy.  When did you do
25   that?

Case 20-06015-JDP   Doc 38-4   Filed 03/03/21   Entered 03/03/21 15:27:40   Desc
Declaration of Matthew T. Christensen   Page 27 of 59

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

---

**10**

1   A   I think it was 2008.
2   Q   Can you --
3   A   2008 or '9.
4   Q   Can you describe for me the events that
5   brought that about, what forced you into bankruptcy?
6   Was there anything?
7   A   The last recession.
8   Q   Let me ask you when you first met Dennis or
9   Alisha Lin.
10   A   I don't understand the question.
11   Q   When did you meet the Lins?
12   A   I think it was 2016, '15 or '16.
13   Q   How did you meet them?
14   A   They were buying a condominium in the
15   development that I was working on.
16   Q   How did you become friends with them?
17   A   Through a few interactions, we got along.
18   Q   When did you start socializing with them?
19   A   2015 or '16.
20   Q   So shortly after you met them?
21   A   Yes.
22   Q   You and your wife started socializing with the
23   Lins; fair?
24   A   Yes.
25   Q   What was your primary source of income at that

---

**11**

1   time?
2   A   RH Brokerage Services.
3   Q   What did RH Brokerage Services do?
4   A   It's a brokerage services company.
5   Q   What does that mean?  I don't know what that
6   means.  A brokerage services company, what does that
7   mean?
8   A   Represent clients in real estate transactions
9   as their broker.
10   Q   What kind of clients did you have?  Were they
11   residential clients or commercial clients or both?
12   A   Primarily commercial clients.
13   Q   Did you own property through RH Brokerage
14   Services or any other entity?
15   A   Yes, a rental house.
16   Q   Where was that?
17   A   Salt Lake.
18   Q   Do you still own that?
19   A   No.
20   Q   Who is the entity that actually owns the
21   house?
22   A   Who owns the house?  Are you talking currently
23   or who owned?
24   Q   Who owned.
25   A   It was an LLC.

---

**12**

1   Q   Called?
2   A   I think it was Bar Properties, 1337 Bar
3   Properties, LLC.
4   Q   That was a rental property?
5   A   Correct.
6   Q   To whom did you sell that?
7   A   I can't recall.
8   Q   Can you describe for me how the friendship
9   with the Lins developed over the course of time from
10   first meeting with them and into 2016 and 2017 before
11   you moved out of Utah?
12   A   We got together on numerous occasions and
13   generally dined together or just hung out.
14   Q   How often?
15   A   I can't recall how often.  It was socially,
16   which would be a few times a month.
17   Q   Who generally would instigate or initiate the
18   contact?  Would you reach out to the Lins or would they
19   reach out to you?
20   A   It would vary.
21   Q   What did you know about the Lins during the
22   course of 2016?  Where were they from, what did they do
23   for a living, et cetera?
24   A   Alisha was from Ogden, Dennis was from the Bay
25   Area, Dennis was in the financial services industry.

---

**13**

1   That's about the extent.
2   Q   Did you have a sense of how much Dennis was
3   earning in the financial services industry?
4   A   No.
5   Q   Mr. Hunt, I'm placing on the screen what's
6   been marked as Exhibit 1.  It's a copy of your tax
7   returns from 2016.  It's Bates labeled DEF 1 through 22.
8   Do you recall filling these tax returns out?
9   A   I don't fill my tax returns out.  I don't
10   prepare my taxes.  They're prepared by my accountant.
11   Q   You sign them, correct?
12   A   Yes.
13   Q   Okay.  I don't recall whether this has been
14   signed by you and your wife.  Do you know whether you
15   possess a signed copy?
16   A   My accountant generally requests a signed
17   copy.
18   Q   Okay.  I want --
19   A   I don't recall if I signed the tax return in
20   his office or not.
21   Q   Fair enough.  Thank you.  I want to walk
22   through the first portion on Page 1, and I'm focusing in
23   particular on Lines 7 through 22.  On Line 7, Wages,
24   Salaries, Tips, Et cetera, $88,529.  Do you see that?
25   A   Yes.

---

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 28 of 59

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

---

14

1  Q   Can you tell me where that came from?
2  A   The information on this was prepared by my
3  accountant.  To the best of my knowledge $88,000 came
4  from my salary from RH Brokerage.
5  Q   Okay.  Line 17 is Rental Real Estate,
6  $101,323.  Do you see that?
7  A   Yes.
8  Q   Where does that come from?
9  A   I don't know.  I'd have to ask my accountant.
10  Q   You indicated that you had a home that was a
11  rental home.  My question now is do you recall how much
12  income the rental home generated on average during the
13  course of the year that it was being rented?
14  A   No.
15  Q   Okay.  Are there royalties or -- strike that.
16       Do you or your wife own any property that
17  would generate a royalty payment?
18  A   No.
19  Q   Were you or wife in 2016 partners in a
20  partnership that generated some kind of distribution?
21  A   I can't recall.
22  Q   How about shareholders in an "S"
23  corporation?
24  A   I can't recall.
25  Q   Okay.  How about any trust payments that you

---

15

1  or your wife might have received?
2  A   No.
3  Q   Okay.  I want to scroll down to Page 7.  Turn
4  to Page 7 of Exhibit 1.  This is the Foreign Tax Credit
5  on Page 7, DEF 7.  There's a reference here to other
6  countries and I just want to know what that's a
7  reference to.
8  A   I don't know.
9  Q   There's a reference above that where I've got
10  my cursor to passive category income.  Do you see that,
11  where the "X" is?
12  A   Uh-huh.
13  Q   "Yes"?
14  A   Yes.
15  Q   Do you know what that's a reference to?
16  A   No.
17  Q   Do you recall as you sit here today whether
18  you or your wife had any investments in foreign entities
19  or foreign sources of income?
20  A   No.
21  Q   Have you ever?
22  A   Not that I can recall.
23  Q   I'm sorry for bouncing around.  I'd like to go
24  back to the first page of Exhibit 1 and focus on Line
25  13, Capital Gain or Loss.  There's an entry for $51,462.

---

16

1  Do you see that?
2  A   Yes.
3  Q   Do you know what that's a reference to?
4  A   I can't recall what it's a reference to.
5  Q   Well, do you recall selling any significant
6  assets that would have generated that kind of capital
7  gain?
8  A   From 2016 I can't recall.
9  Q   Okay.  On the next page of Exhibit 1, on Line
10  40 there is a reference to Itemized Deductions, $53,670.
11  Do you see that?
12  A   Yes.
13  Q   Do you know what those deductions consisted
14  of?
15  A   No.
16  Q   Are they business expenses or anything like
17  that?
18  A   Like I said, my CPA prepares my tax returns.
19  I don't know.
20  Q   Okay.  Who gives Derek Evans the information
21  that he uses to prepare the taxes?
22  A   I do.
23  Q   So is it your testimony that you don't really
24  know what it is you're giving to him?
25  A   I give him what he asks for.

---

17

1  Q   Okay.  Does he ask for the same kind of things
2  every year?
3  A   Yes.
4  Q   So what does he ask for?
5  A   He sends a standard packet.
6  Q   Do you have any recollection as you sit here
7  today of the kinds of things that he asks for in his
8  standard packet?
9  A   A record of income and expenses.
10  Q   Do you have any recollection as you sit here
11  today of the kinds of documents that you would give him
12  to satisfy his inquiry?
13  A   Mortgage interest statement, things like
14  that.
15  Q   Anything else that you might recall?
16  A   No.
17  Q   Let's take a look at -- bear with me for a
18  second here.  Let's take a look at Page 9 of Exhibit 1,
19  DEF 9.  This is Sale of Business Property.  There's a
20  reference here to Bar 1337 Properties, LLC.  Do you see
21  that?
22  A   Yes.
23  Q   Is that a reference to the rental home that
24  you sold?
25  A   Yes.

---

18

1    Q   The $49,000 or nearly $50,000, that's the gain
2   you made on it?
3    A   That's what the gain was based on the tax
4   return.
5    Q   Okay.  Do you recall whether following this
6   sale you -- strike that.
7        Is there a reason why you chose to sell this
8   property?
9    A   The partners agreed that it was a good time to
10   sell.
11    Q   Okay.  Did the partners take the proceeds and
12   invest in another property?
13    A   I don't know.
14    Q   Okay.  There came a time in 2017 where you and
15   your wife decided to move from Salt Lake City.  Do you
16   recall that?
17    A   Yes.
18    Q   Why did you want to move?
19    A   Exploring other opportunities for our
20   family.
21    Q   Without getting overly involved, what do you
22   mean by that?
23    A   Exploring other opportunities for our family.
24   I have two children and they swim and they're very smart
25   girls and they -- trying to figure out some

19

1   opportunities for them long term.
2    Q   Again, I don't want to belabor it, I'm just
3   trying to get a sense of what you mean by opportunities.
4   Do you mean athletic opportunities, educational
5   opportunities?
6    A   Both.
7    Q   Where did you want to go?
8    A   We didn't know.
9    Q   When did you start thinking seriously about
10   moving out of Salt Lake?
11    A   More or less the first part of 2017, January
12   or February.
13    Q   How were you doing financially at that
14   point?
15   MR. CHRISTENSEN:  Object to the form.
16   THE WITNESS:  In what context?
17   BY MR. EGAN:
18    Q   Were you making money?
19    A   Yes.
20    Q   Were you making the same amount of money that
21   you were the year before?
22    A   I can't recall.
23    Q   Were your prospects for business encouraging
24   or discouraging or neutral?
25    A   Neutral.

20

1    Q   Did you have a feeling that 2017 would be a
2   good year for you or a bad year?
3    A   I was neutral on that as well.
4    Q   Why was that?  What was causing you to be
5   uncertain?
6    A   I didn't say I was being uncertain; I said I
7   was neutral.
8    Q   What was causing your neutrality?
9    A   I didn't want to be overly optimistic.
10    Q   Were there things going on in the real estate
11   market of concern to you?
12    A   No.
13    Q   Were there things going on in the real estate
14   market that were encouraging to you?
15    A   Yes.
16    Q   Such as?
17    A   Transactions of the business and the housing
18   market.
19    Q   I'm sorry, Mr. Hunt.  I didn't mean to cut you
20   off.  The housing market in Utah was actually improving
21   substantially in 2017, was it not?
22    A   Improving?  What do you mean by that, Sean?
23    Q   It was getting better.  People were moving
24   into Salt Lake, prices were going up.  That's what I
25   mean by improving.

21

1    A   Yes.
2    Q   Okay, Mr. Hunt.  I'm placing on the screen
3   what's been marked as Exhibit 2.  It is your 2017 tax
4   return.  I want to focus -- do you have a basis to
5   conclude that these are not the tax returns you and your
6   wife filed in 2017?
7    A   I have no basis to conclude that or not.
8    Q   On Line 7 you indicate that wages and
9   salaries, et cetera are $10,000.  Do you see that?
10    A   Yes.
11    Q   That's substantially less than the $88,000
12   from 2016; would you agree?
13    A   Yes.
14    Q   Can you tell me why there was that substantial
15   drop?
16    A   RH Brokerage services didn't bring in the
17   income it did the year prior.
18    Q   Is there a reason why?
19    A   Transactions weren't closed through RH
20   Brokerage Services to generate revenue.
21    Q   Were there other avenues for generating income
22   for you?
23    A   My primary focus was working for RH Brokerage
24   Services.
25    Q   It's my understanding there's an entity called

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 30 of 59

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

**22**

1    RH Development, or there was. Is that true?

2    A    Yes.

3    Q    What's that, or what was it in 2017?

4    A    It was an entity I just wanted to use to

5    primarily put together real estate developments.

6    Q    Were you able to do that in 2017?

7    A    No.

8    Q    How about at any other time?

9    A    No.

10    Q    If we go down to Line 17, Rental real estate

11    royalties, et cetera, it's a negative $17,057. Do you

12    see that?

13    A    No, I don't see it on the screen.

14    Q    I apologize. You're right. Here we go. See

15    that?

16    A    Yes.

17    Q    Can you tell me what brought about this loss

18    of $17,000?

19    A    I can't recall.

20    Q    It's a pretty significant loss; would you

21    agree?

22    A    In comparison to what?

23    Q    Just generally.

24    A    It seems to be a lot of money but I can't

25    recall what it's from.

**23**

1    Q    Okay. By the way, Mr. Hunt, on average, say

2    from 2013 to the present what's your annual income

3    been?

4    A    I can't recall.

5    Q    You couldn't approximate how much you've made

6    over the course of seven or eight years?

7    A    No. My accountant calculates -- I would say

8    the revenue brought in through RH Brokerage Services has

9    been inconsistent as, you know, the market has its ups

10    and downs.

11    Q    Okay. Did there come a time when a more

12    concrete plan emerged or was developed for moving out of

13    Salt Lake City?

14    A    Over the first few months in 2017, I had -- my

15    wife and I and the Lins looked at some different

16    properties, different locations.

17    Q    Okay. Did you wind up making a concrete plan

18    to move?

19    A    Yes.

20    Q    Okay. What was that plan?

21    A    The plan was to sell the house and move to

22    Irvine, California.

23    Q    Now your house, is this the one on Kensington

24    Avenue?

25    A    That is correct.

**24**

1    Q    Do you recall how much you listed the house

2    for?

3    A    I think there was a few listing prices.

4    Q    Okay. Do you recall how much it sold for?

5    A    Above $900,000.

6    Q    Do you know how much above $900,000?

7    A    I can't recall the specific amount. I think

8    it was somewhere around 930.

9    Q    Okay. How much did you owe on the house?

10    A    I can't recall specifically. We had a first

11    and a second.

12    Q    Well, approximately how much, do you know?

13    A    Approximately 750, 700, 750, I think. I'm not

14    sure.

15    Q    So it's fair to say that -- let me back up. I

16    should have done this originally. You and your wife

17    owned the Kensington Avenue house as joint tenants,

18    correct?

19    A    Yes.

20    Q    Okay. So it's fair based on what you've told

21    me -- and I'm not holding you to specific numbers, just

22    a general range or order of magnitude. The house sells

23    for approximately $930,000 and you owe approximately

24    $750,000 to banks on the house. So you're looking at

25    netting about $180,000 from the sale; is that fair?

**25**

1    A    It seems right, the math that you're doing.

2    Q    Okay. Do you have a recollection of

3    approximately how much you and your wife netted from the

4    sale of the house?

5    A    There was wire transfer records that you have

6    from a U.S. Bank statement that shows that. I don't

7    know exactly.

8    Q    Okay. So the plan is to move to Irvine. What

9    role did the Lins play, if any, in this plan to move to

10    Irvine?

11    A    They were supportive of the move.

12    Q    Well --

13    A    About 2017, probably February, Dennis and

14    Alisha Lin were at our house on Kensington and we were

15    talking about moving. After they had left the house

16    Dennis called back and told me that we need to get the

17    kids out of Salt Lake and give them better

18    opportunities. At that time he disclosed that he made

19    north of eight figures in 2016 and he wanted to give me

20    money to help with the move. And at that point I took

21    him rather serious as it relates to being helpful and

22    wanting us to move.

23    Q    Okay. Did the Lins do anything else in

24    connection with the move?

25    A    They traveled with Maile and I to the Phoenix

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 31 of 59

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

26

1  area and to Irvine to look at homes.
2      Q    Why was it important to you to buy a home as
3  opposed to rent?
4      A    Security for my children.
5      Q    Security in what sense?
6      A    It's more -- I wanted the children to know
7  that we owned the home versus renting so we were not
8  subject to someone else's input or control of the
9  property that we were using as a primary residence.
10      Q    Okay.  But at that point I think we've
11  established that you were not generating any revenue,
12  either a salary or commissions from selling real estate,
13  correct?
14      A    My client had property under contract and I
15  was a party to it as a brokerage that would receive a
16  commission upon close.
17      Q    Who was that?
18      A    Who's the client?
19      Q    Yeah, and what was the property.
20      A    I think that client's company was MW
21  Development or something like that.  The property was on
22  an industrial piece of land in Millcreek City, Utah.
23      Q    Okay.  What would have been approximately the
24  size of the commission?
25      A    Approximately $170,000.

27

1      Q    When was that Millcreek property scheduled to
2  close?
3      A    I can't recall the exact date offhand but
4  sometime in the summer of 2017.
5      Q    Do you recall who the seller was in that
6  Millcreek property?
7      A    The Miller family.
8      Q    Do you mean Gail Miller or some other
9  Miller?
10      A    I don't think it was a Gail Miller.  It was a
11  different Miller.
12      Q    So it's not part of the Larry H. Miller
13  constellation of Millers?
14      A    I don't think so.
15      Q    Okay.
16      A    I was not representing the seller.
17      Q    What's the name of the principal of MW
18  Development?
19      A    Garrison Hassenflu.
20      Q    He's the guy from Kansas City, right?
21      A    Yes.
22      Q    Okay, Mr. Hunt.  I've placed before you what's
23  been marked as Exhibit 3.  It's a purchase and sale
24  agreement for commercial real estate between Windriver
25  Investments and MW Development Enterprises.  I believe

28

1  this is a document that you provided to us in connection
2  with some filings you made in this case.
3          First of all, take a look at Exhibit 3 and
4  just let me know if you recognize what it is.  I'll
5  scroll through it.
6      A    Yes, it looks like the original purchase
7  contract.
8      Q    As I read the bottom of that first page, it
9  looks like it was signed -- I'm sorry.  I don't mean
10  to -- let's just figure this out.  I'm scrolling all the
11  way to the end.  It looks to me like this contract was
12  signed in July of 2017; would you agree?
13      A    Is that the extension?  I know we went through
14  some extensions.
15      Q    I don't think this is the extension.  This is
16  the hard part about doing Zoom.  Let me just go page by
17  page and give you a chance to see it.
18          Would you agree with me, Mr. Hunt, that this
19  contract was signed by your client Mr. Hassenflu on or
20  about July 1st, 2017?
21      A    From the dates on it, it looks that way.  I
22  can't recall the exact date.
23      Q    Okay, that's fair.  But that's after you made
24  the commitment to leave and move to California,
25  correct?

29

1      A    Correct.
2      Q    Okay.  So if I'm hearing you correctly, please
3  correct me if I'm wrong, part of your calculation in
4  making the move and buying the house is that you were
5  expecting the money to come, right?
6      A    Yes.
7      Q    Okay.  Let me scroll back to the front page of
8  the contract.  I want to focus on this provision right
9  now.  Sorry.  The due diligence deadline here, "120
10  calendar days after full execution of the purchase and
11  sale agreement."  Do you see where I'm reading?
12      A    Yes.
13      Q    Okay.  Just rounding off days, the agreement
14  is signed on July 1st.  We've got August, September,
15  October and November before the due diligence deadline
16  even expires, right?
17      A    Yes.
18      Q    Then the settlement deadline would be 135 days
19  after full execution.  So that puts us at around
20  December 1st, does it not?
21      A    Yes.
22      Q    Okay.  So my question to you is how were you
23  anticipating you would be able to conduct your affairs
24  financially, including paying a mortgage, if the source
25  of income wasn't going to get to you until the end of

LIN vs HUNT
Rinaldo Hunt

January 12, 2021



**30**

1   the year?
2       A    Well, those are just dates in the contract.
3   At the time Millcreek City was newly incorporated.  So
4   from the input we received from the City, those time
5   frames could have been accelerated substantially based
6   on --
7       Q    Or delayed.
8       A    Or delayed, either/or.  But the information we
9   were receiving from the Mayor and the Planner were very
10  positive.
11      Q    During this time period while you're talking
12  to the Mayor and the Planning Commission in Millcreek
13  City, where was the income -- sorry -- where were you
14  getting funds to pay your obligations, your two
15  mortgages and food and so forth?
16      A    From what time period, Sean?
17      Q    From the start of 2017.  Where was the money
18  coming from to pay your day-to-day expenses and
19  liabilities?
20      A    I don't know exactly.  I can't recall.  I
21  assume some income was coming through RH Brokerage.  And
22  we potentially had some savings but I can't recall
23  exactly.
24      Q    The Millcreek deal, did it close?
25      A    No.

**31**

1       Q    Were there extensions entered into between and
2   among the parties here in the Millcreek deal?
3       A    Yes.
4       Q    Okay.  And they pushed closing or potential
5   closing into 2018, did they not?
6       A    Yes.  And at that time the buyer had also --
7   was also relinquishing certain earnest money, spending
8   additional money on architects, engineers and whatnot.
9       MR. EGAN:  Let's take a five-minute break.
10
11              (Off the record.)
12
13  BY MR. EGAN:
14      Q    Mr. Hunt, I'm placing on the screen a series
15  of texts and emails between and among you, Dennis Lin,
16  your wife and Alisha Lin.  I'm going to go ahead and
17  scroll through them and just ask if you've ever seen
18  these texts and emails before.
19      MR. CHRISTENSEN:  Sean, are these the ones that
20  were attached to your amended complaint?
21      MR. EGAN:  Yes.  It's Bates labeled Lin 1 through
22  21.
23      MR. CHRISTENSEN:  Sean, which exhibit number did
24  you say?
25      MR. EGAN:  This is Exhibit 4.

**32**

1       MR. CHRISTENSEN:  Was there an Exhibit 3 that I
2   missed?
3       MR. EGAN:  Yeah, Exhibit 3 is the agreement.
4   BY MR. EGAN:
5       Q    Mr. Hunt, just scrolling through these, do
6   these texts and emails seem familiar to you?
7       A    Yes.
8       Q    Have you reviewed these texts and emails in
9   connection with this litigation?
10      A    Not recently.
11      Q    Let me go back to the top and start on Lin 2.
12  It's a text from you to Dennis Lin dated June 4th, 2017.
13  Do you see that?
14      A    Yes.
15      Q    "Can you transfer some dough end of June or
16  July?  I confirmed the final walk-through today on 9-7
17  and the close on 9-14."  Do you see that?
18      A    Yes.
19      Q    I assume, but please tell me if I'm wrong, I
20  assume that what you're saying to Mr. Lin is you have
21  confirmed a final walk-through on the house that you're
22  purchasing in Irvine with a closing on September 14th.
23  Is that correct?
24      A    Correct.
25      Q    Okay.  When you made this request of Mr. Lin,

**33**

1   how much dough were you thinking of?
2       A    I can't recall exactly the amount.
3       Q    Well, approximately.
4       A    $100,000 or so.
5       Q    Why did you need it?
6       A    For bank requirements.
7       Q    Tell me -- I'm sorry?
8       A    Money for the down payment.
9       Q    What were the bank requirements?
10      A    I can't recall exactly.
11      Q    Tell me what you recall.
12      A    That they needed -- that they required a
13  specific down payment and they required some money in
14  the bank, half of the down payment.
15      Q    Okay.  So the purpose of the money, if I heard
16  you correctly, was to put in the bank, and also to help
17  with the down payment, is that right?
18      A    Potentially.
19      Q    If we scroll through, you say on Lin 4, "I
20  need to ensure the optics are there for the lender and
21  we have enough to cover the basics."  Do you see that?
22      A    Yes.
23      Q    You're not saying anything about assisting in
24  the down payment, are you?
25      A    At the time I didn't have a specific quote to

34

1  work off of.  I was going off what was said by the
2  mortgage broker.
3      Q   How much was the down payment going to be?
4      A   I didn't know exactly.
5      Q   Let me take a step back.  This house that
6  we're talking about in Irvine, is this the house on
7  Magnet Street or Magnet Avenue?
8      A   Correct.
9      Q   Okay.  How much was the list price for that
10  house?
11      A   Approximately 775, but I can't recall exactly.
12  Or 800.
13      Q   Okay.  So your best recollection of the list
14  price for the Irvine house was somewhere around $750,000
15  to $800,000 or so; is that fair?
16      A   Yes.
17      Q   Okay.  In your experience as a realtor
18  assisting buyers and sellers with residential real
19  estate, approximately how much would a down payment be
20  on a house of that value?
21      A   I told you earlier in the deposition that my
22  primary course of business is with commercial property
23  owners.  I didn't know what the down payment requirement
24  was.
25      Q   Were you ever told -- strike that.

35

1          What did the down payment turn out to be?
2      A   I can't recall offhand.
3      Q   Okay.  But in any event, you're not telling
4  Dennis Lin you're going to use the money you want to
5  borrow from him to pay for the down payment, correct?
6      A   In this text message?
7      Q   Right, this specific text.
8      A   I think there's implication as it relates to
9  where the money goes, whether it's in the bank or
10  towards the down payment in conjunction with the loan.
11      Q   I'm focusing on the text that you sent to Mr.
12  Lin on June 4th where you're asking for money.  You
13  don't tell him that the money that you're asking for is
14  going to be used at least in part to pay the down
15  payment on the Irvine home, correct?
16      A   The specific text message does not indicate
17  anything related to a down payment.
18      Q   In the next sentence of this you say, "I am
19  closing two deals early fourth quarter and should be
20  more than able to repay any remaining obligations."  Do
21  you see that?
22      A   Yes.
23      Q   What were those two deals?
24      A   It was the Hassenflu/MW Development deal.  And
25  I think there was a potential industrial acquisition

36

1  that I was working on but I can't recall exactly what
2  transaction.
3      Q   Okay.  We went over in Exhibit 3 the MW
4  investment contract, which I had been calling the
5  Millcreek deal.  Are you comfortable calling that the
6  Millcreek deal?
7      A   Sure.
8      Q   Okay.  We went over the contract.  And I
9  thought we determined that the earliest the contract was
10  going to close, at least according to its language, was
11  going to be December 2017, correct?
12      A   I indicated that my discussions with the City
13  were positive and it could have closed potentially
14  sooner.
15      Q   At the time you sent this text to Dennis Lin,
16  June 4th, 2017, did you have any documentation showing
17  that the closing of the Millcreek deal might happen
18  earlier?
19      A   Not that I can recall.
20      Q   Okay.  Had there even been any planning
21  minutes or meetings on or about June 4th -- strike that.
22          Prior to June 4th had there been any planning
23  committee meetings of any kind in which approvals had
24  been given to you or to Mr. Hassenflu?
25      A   I can't recall.

37

1      Q   Well, it would be unusual for a City to grant
2  approvals with respect to a transaction -- I'm sorry --
3  with respect to the development of a property if there
4  isn't even a land sale contract, right?
5      MR. CHRISTENSEN:  Object to the form and to the
6  extent it calls for speculation.
7      THE WITNESS:  Please repeat the question.
8  BY MR. EGAN:
9      Q   Sure.  In your experience with commercial real
10  estate, Mr. Hunt, have you ever seen a situation where a
11  municipality is giving approvals for the development of
12  property when the property is not even under contract to
13  the person doing the development?
14      A   It may not be based on the approval of the
15  project but rather the zoning that is necessary to
16  proceed with the project.
17      Q   What was the project in the Millcreek deal?
18  What was that project going to be?  Was that going to be
19  residential housing?
20      A   Mixed use, housing and light commercial.
21      Q   Okay.  I think what you're telling me is one
22  deal was the Millcreek deal and the other deal was --
23  I'm sorry for spacing out.  Can you remind me what the
24  other deal was?
25      A   At the time I recall that I had some

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 34 of 59

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

---

**38**

1  discussions about an industrial acquisition.
2      Q    Did any of those discussions get memorialized
3  into actual purchase contracts?
4      A    No.
5      Q    I think you --
6      A    I think there was a letter of intent
7  submitted.
8      Q    Did you produce that letter of intent to me?
9      A    I don't know that I produced a letter of
10  intent from my side.
11      Q    Do you still have possession of any
12  documentation reflecting this industrial acquisition?
13      A    Not that I can recall.
14      Q    Who were the parties to the industrial
15  acquisition?
16      A    I think it was the same agent that I was
17  working with on the Millcreek deal.
18      Q    And who was that?
19      A    Rusty Bollow.
20      Q    Do you remember where this industrial property
21  was located?
22      A    On the west side of Salt Lake City.
23      Q    Do you know where?
24      A    No.
25      Q    Do you remember who the acquiring party was?

---

**39**

1      A    No.
2      Q    You go on to say in this text, "At a minimum,
3  the majority of your dough will be back in your pocket
4  shortly after we close in California from the Utah
5  proceeds." Do you see that?
6      A    Yes.
7      Q    Okay. If you're closing or expecting to close
8  in mid September, it would be fair to assume that the
9  majority of the money being advanced by Dennis Lin or
10  the Lins to you will be back in their pocket sometime
11  late September/early October, right?
12      A    That was the initial intent.
13      Q    Okay. You go on to have a discussion with Mr.
14  Lin. And I'm summing it, you don't have to accept my
15  summary, but I'm summarizing his remarks to be a
16  discussion with you about the cost to him of pulling
17  money out of a fund that he manages in order to advance
18  this money to you. Would you agree with that
19  characterization generally?
20      A    That's what he said in the text.
21      Q    Okay. On Lin 5 you say, "I'll need the 225K
22  for sure." Do you see that?
23      A    Yes.
24      Q    Where did that sum come from?
25      A    Some houses that we had looked at in Irvine

---

**40**

1  that were more expensive than the house we ultimately
2  purchased.
3      Q    In the course of this exchange -- I want to
4  focus on Lin 6. I apologize that it's a bit faint but
5  I --
6      A    I can't read any of it.
7      Q    I'll try to enlarge it a little. "It feels
8  like at first you wouldn't have even needed the money
9  and now you need a quarter million. Are you buying a
10  house that you aren't qualified for?" Do you see
11  that?
12      A    Yes.
13      Q    Did you respond to Mr. Lin to that direct
14  question?
15      A    I don't recall.
16      Q    At the bottom of Lin 6 you say to him, "I
17  agree. As tough as open communication is sometimes to
18  initiate, it sure feels good to work out feelings and
19  issues." Do you see that?
20      A    I can't see anything.
21      Q    You're right. That's on me. Down here.
22      A    I can see that.
23      Q    On June 5th, 2017, Mr. Lin says "Good talk,
24  brother. I think we are on the same page and get each
25  other on all topics. Love you, man." Then you say, "I

---

**41**

1  agree. As tough as open communication is sometimes to
2  initiate, it sure feels good to work out feelings and
3  issues." So this suggests to me that you and Mr. Lin
4  had a telephone call; is that fair?
5      A    Yes.
6      Q    Okay. What do you recall of that telephone
7  call?
8      A    I don't recall any real specifics.
9      Q    Okay. So we should look to Mr. Lin's
10  recollection then?
11      A    I don't know what you should look for. I
12  can't recall specifically what I said on the phone
13  call.
14      Q    Okay. If we move forward to Lin 8, there's a
15  note here that says -- it's dated May 12th, 2017. She
16  says -- whoever wrote this says, "I'm writing this to
17  just the two of you. Rinaldo needs all your support.
18  He didn't make the short list for the downtown project.
19  He is upset and crushed. It's a total insult,
20  especially when his partner wrote the Affordable Housing
21  Act that is currently in effect for the entire USA" and
22  she goes on, or the writer goes on. Do you see where
23  I'm at?
24      A    Yes.
25      Q    Okay. Do you know who wrote this note?

---

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 35 of 59

LIN vs HUNT
Rinaldo Hunt
January 12, 2021

42

1    A    Most likely Maile, my wife.
2    Q    What downtown project is she referring to?
3    A    It was an RFP for a mixed use affordable
4    housing project.
5    Q    Who was your partner?
6    A    My wife was mistaken. It was not an actual
7    partner. It was someone that I would be representing as
8    a potential partner in a development if the RFP was
9    approved and ultimately accepted by the City of Salt
10    Lake.
11    Q    Can you be more specific about what that
12    project was?
13    A    It was a mixed use affordable housing project
14    in downtown Salt Lake City.
15    Q    Do you recall where?
16    A    Approximately 4th South and 3rd East.
17    Q    Okay. Who was the person you were working
18    with?
19    A    As far as?
20    Q    I think you indicated that your wife was
21    mistaken about this person being your partner, that it
22    was somebody that you were going to either represent or
23    work with in connection with this project. My question
24    to you is who was that?
25    A    There was a gentleman named Mark Tolley

43

1    (phonetic), and then his partner, which they were going
2    to participate in the transaction, was and still is
3    Henry Cisneros.
4    Q    Okay. Were you in any way counting on the
5    income to be generated from this downtown project?
6    A    I don't understand your question.
7    Q    Looking at your tax returns, the total amount
8    of money that you made in the course of 2017 was $10,000
9    in wages. So it suggests to me that money is not coming
10    in to you, that you're either taking it out of savings
11    or some other source, right?
12    A    Yes.
13    Q    Okay. What I mean is were you hoping that
14    this project -- were you relying on being successful in
15    this project to be a source of income for you for
16    2017?
17    A    No. It was a project I would have liked to
18    put together, but no.
19    Q    Okay. At the time you sent the text to Dennis
20    Lin on June 4th, 2017, you had the Millcreek project,
21    although that had not been put into a signed agreement,
22    you had an industrial acquisition that you don't even
23    remember who the buyer was, you had this RFP that didn't
24    work out. What other transactions did you have that
25    were -- that you could look to for sources of revenue in

44

1    the spring of 2017?
2    A    I can't recall.
3    Q    Okay. I want to focus your attention on Lin
4    21, which is the last page of Exhibit 4. This is an
5    email from you to Dennis Lin dated June 29th, 2017. You
6    say, "Thanks for the sendoff last night. It was very
7    thoughtful. Maile and I were paying bills and settling
8    accounts last nights after you two left. After we paid
9    down debts, real estate comp., CC bills, et cetera, we
10    will have about $110,000 in cash. The loan requires
11    $180,000 down and us to show reserves of six months."
12    Do you see that?
13    A    Yes.
14    Q    Okay. At this point had you sold the
15    Kensington Street house?
16    A    I think the closing date of Kensington was at
17    the end of June. So for all intents and purposes it was
18    closed, it was just going to be recorded, finalized the
19    next day.
20    Q    Okay. The next sentence, "The loan requires
21    180K down." At this point had you submitted a loan --
22    strike that.
23    Had you been approved for a loan by a bank to
24    purchase the Irvine home as of June 29th, 2017?
25    A    I can't recall. I ended up working with a

45

1    mortgage broker.
2    Q    What was the name of that mortgage broker?
3    A    EMRI or PRMI.
4    Q    Was there a specific person?
5    A    There was an agent, a gentleman. I think his
6    name was Jim Hudlemeyer.
7    Q    Now in that sentence that I was just referring
8    to, "The loan requires" --
9    A    There may have been another agent through the
10    seller in California but I can't recall at that time if
11    that was just the seller's real estate mortgage lender
12    or the other mortgage broker.
13    Q    Okay. Back to the email of June 29th. You
14    say, "The loan requires 180 down and us to show reserves
15    of six months." Do you see that?
16    A    Yes.
17    Q    What did you mean when you said that?
18    A    Reserves in the checking account equal to six
19    months of expenses.
20    Q    Okay. You go on to say, "So we need to prove
21    out approximately $230,000 in the checking prior to
22    close," correct? Do you see that?
23    A    Correct.
24    Q    What do you mean there? What do you mean when
25    you say that?

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 36 of 59

January 12, 2021

LIN vs HUNT
Rinaldo Hunt

46

1    A   That there needs to be $230,000 in the
2   checking, which would include the down payment and
3   reserves.
4    **Q   But all you're saying here is the reserves.**
5    A   No.
6    **Q   I understand what you're saying.  All right.**
7   **I apologize.  You're looking to the Lins to close the**
8   **gap, correct?**
9    A   Potentially.
10    **Q   Okay.  Now you also say at the end of that**
11   **paragraph, "If we show funds 60 days prior to closing in**
12   **the account I don't need any special CPA letters from**
13   **the underwriters."  Do you see that?**
14    A   Yes.
15    **Q   What kind of CPA letters might you have needed**
16   **if you didn't get the money?**
17    A   I don't know.  It seems that most lenders are
18   different.
19    **Q   Well, in your experience have you come across**
20   **so-called CPA letters?**
21    A   Not in commercial real estate.  I don't get
22   involved in the lending side.
23    **Q   Well, I'm assuming you've seen in the course**
24   **of your experience that borrowers will often have to**
25   **attest to lenders whether they've filed for bankruptcy**

47

1   in the past, right?
2    A   I don't understand your question.
3    **Q   You have seen it in your experience that**
4   **borrowers have had to represent to lenders their**
5   **bankruptcy history as part of obtaining a loan, right?**
6   **You've seen that?**
7    A   Yes.
8    **Q   Okay.  And it's fair, is it not, Mr. Hunt,**
9   **that one of the things you were concerned about is that**
10   **if you didn't get this money from the Lins and close the**
11   **gap, that you would have to disclose to your potential**
12   **lenders that you had filed for bankruptcy in 2009,**
13   **correct?**
14    A   No.
15    **Q   Okay.  Mr. Hunt, I've placed before you what's**
16   **been marked as Exhibit 5.  It's a uniform residential**
17   **loan application.  Let me scroll through it.**
18    **First of all, do you recognize that signature**
19   **on the first page there?**
20    A   Yes.
21    **Q   Is that yours?**
22    A   Yes.
23    **Q   If we scroll through, do you recognize this to**
24   **be the loan application that you filled out in**
25   **connection with the purchase of the Irvine home?**

48

1    A   It seems to be.
2    **Q   Again, that's your signature, correct?**
3    A   Yes.
4    **Q   Did your wife ever sign this?**
5    A   No, I don't recall.
6    **Q   Okay.  And you signed this on September 25th,**
7   **2017, right?**
8    A   Yes.
9    **Q   That's approximately two weeks after you told**
10   **Dennis Lin that the house would be closing or that you**
11   **would be closing on the purchase of the house, right?**
12    A   Yes.
13    **Q   Let's focus on the first page here.  It**
14   **indicates that you're seeking a loan of approximately**
15   **$694,000, correct?**
16    A   Yes.
17    **Q   Then down here there's a reference to the down**
18   **payment and it says borrower owned funds, right?**
19    A   Yes.
20    **Q   Now looking at this document, can you recall**
21   **from the course of the deposition testimony how much**
22   **your down payment was?  I guess it was $180,000.  I**
23   **guess we established that, right?**
24    A   I don't recall.
25    **Q   Well, I'm looking at the note.  You say the**

49

1   loan requires 180K down.  That's from Exhibit 4.  It's
2   **on Lin 21.  The loan requires 180K down, right?**
3    A   That was prior to engaging U.S. Bank, so I
4   don't know.
5    **Q   Well, did you make a loan application through**
6   **some other lender?**
7    A   I indicated PRMI or EMRI.
8    **Q   Did you actually fill out a loan application**
9   **with that mortgage company?**
10    A   I can't recall if they were a mortgage
11   broker.
12    **Q   But did they actually facilitate the purchase**
13   **of the house?**
14    A   No.
15    **Q   What happened?**
16    A   What do you mean what happened?  I don't
17   understand the question.
18    **Q   Why didn't you follow through and borrow from**
19   **them?**
20    A   Because the loan that they were presenting was
21   probably not as competitive.
22    **Q   Yeah, but aren't you telling the Lins this is**
23   **what you need to have in order to purchase the home?**
24    A   From the original mortgage broker that Dennis
25   talked to on the phone with myself in Phoenix.

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 37 of 59

January 12, 2021

LIN vs HUNT
Rinaldo Hunt



50

1    Q.    Okay.  Did you ever tell the Lins that you
2    didn't wind up doing a deal through that mortgage
3    broker?
4    A.    I can't recall exactly, but yes, most likely
5    by phone.
6    Q.    Did you tell the Lins at that point let me
7    send the money back to you and just hold onto it until
8    we do this application process again?
9    A.    The house was still under contract to
10   purchase.
11   Q.    Okay.  Did you file any extensions with the
12   owner or the seller?
13   A.    It was a new construction home.  The seller
14   was extending its contract.
15   Q.    Okay.  If the mortgage company said the down
16   payment was $180,000, does that refresh your
17   recollection at all of how much the down payment was as
18   required by U.S. Bank?
19   A.    No.
20   Q.    Do you recall whether it was significantly
21   more or significantly less than $180,000?
22   A.    No.
23   Q.    Okay.
24   A.    I have to use the restroom.  Let's take a
25   five-minute break.

51

1    Q.    Sure.
2
3              (Off the record.)
4
5    BY MR. EGAN:
6    Q.    Was there ever a document generated by either
7    a lender or by the seller indicating that closing for
8    the Irvine property was going to take place on September
9    14th, 2017?
10   A.    I can't recall exactly.  But the original
11   purchase contract was for a new construction home so I
12   think it didn't stipulate a date.
13   Q.    At what point did you stop using PMRI or
14   whoever to obtain financing for the Magnet home?
15   A.    I can't recall the exact date.
16   Q.    Well, approximately.
17   A.    July, into August.  July, beginning of August,
18   somewhere around there.
19   Q.    I meant to do this before, but I wanted to
20   focus on -- Dennis Lin sent you a response on June 29th.
21   It says, "House stuff?"  You say, "End of September
22   close.
23         "Yep, that should work.  120K-ish at the end
24   of July.  That is 60 days before close.  Should be
25   doable."  That's Mr. Lin agreeing to advance you the

52

1    money, correct?
2    A.    Yes.
3    Q.    Let's go back to the loan application.  I want
4    to focus now on the second page.  Here you're
5    representing to the bank that your gross monthly income
6    is approximately $16,000.  Do you see that?
7    A.    Yes.
8    Q.    But you hadn't been making $16,000 a month,
9    had you?
10   A.    I can't recall where that figure came from.
11   Q.    Okay.
12   A.    Generally it was tax return related.  I don't
13   know.
14   Q.    Okay.  But the fact is that during the course
15   of 2017 you were not making $16,000 a month, correct?
16   A.    At that time -- define "making $16,000 a
17   month."
18   Q.    You were not generating gross monthly revenue
19   of $16,000 a month during the course of 2017 as you
20   represented to the bank, were you, correct?
21   A.    Generating through what?
22   Q.    Through anything.
23   A.    We sold our home.  And they also indicate
24   prior tax returns.  So I don't know where the $15,962
25   came from.

53

1    Q.    Okay.  I'm following up on that by asking you
2    to confirm for me that you did not have a gross monthly
3    income of $15,962 at any time during the course of 2017,
4    right?
5    A.    Personally I had not paid myself through the
6    company.
7    Q.    That wasn't my question.  You were not
8    generating $15,962 in monthly gross income at any time
9    during the course of 2017, right?
10   A.    On a personal level or through the company?
11   Q.    I'm looking at you.
12   A.    I told you I don't recall where the $15,962
13   number came from.  Generally they require tax returns.
14   Q.    I understand that you don't recall where the
15   number comes from.  I'm asking you to independently
16   confirm that at no time during the course of 2017 did
17   you generate gross monthly income in the amount of
18   $15,962.
19   MR. CHRISTENSEN:  I'll put an objection on the
20   record to form to the extent you're asking him to
21   retroactively testify.
22   BY MR. EGAN:
23   Q.    Go ahead, Mr. Hunt.
24   A.    The number $15,962 that's on the screen, I
25   don't recall where that number came from.

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 38 of 59

January 12, 2021

LIN vs HUNT
Rinaldo Hunt

54

1    Q   I understand.  But in addition to you not
2   recalling, you did not make $15,962 in gross monthly
3   income at any time during the course of 2017, correct?
4       MR. CHRISTENSEN:  Are you asking him based on his
5   knowledge now or at the time the application was filled
6   out?
7       MR. EGAN:  Either one, whichever can help him
8   answer the question.
9       THE WITNESS:  I do not know where the number
10  $15,962 came from.
11  BY MR. EGAN:
12     Q   Right.  And you did not make or generate gross
13  monthly income of that magnitude at any time during the
14  course of 2017, correct?
15     A   I do not know what the corporate tax return
16  stated at the time when I was working for RH Brokerage
17  and what the request from the bank was for the prior
18  year's taxes or what.  I do not know where the amount
19  came from.
20     Q   The company wasn't borrowing money to buy the
21  home, right?  You were.
22     A   The money was wired to the company.
23     Q   Who's the borrower in Exhibit 5, is it you or
24  the company?
25     A   I am the borrower.

55

1      Q   Right.  So when the application asked you for
2   gross monthly income they're referring to you, the
3   borrower's gross monthly income, correct?
4       A   There's an asterisk that says base employment
5   income.  It says self-employed borrowers may something
6   or other.  I was viewed by the bank as a self-employed
7   borrower.
8       Q   Okay.  Have you provided to me during the
9   course of this litigation any of the tax returns that
10  you provided to U.S. Bank?
11     A   Everything you've requested I've provided.
12  U.S. Bank requested tax returns.  I don't recall what
13  years but I provided them.
14     Q   Do you recall providing them corporate tax
15  returns?
16     A   I don't recall.  But if they asked for it, I
17  provided them everything they asked for.
18     Q   But as you sit here today, Mr. Hunt, you don't
19  have any recollection that you ever made $15,962 in
20  gross monthly income during the course of 2017,
21  correct?
22     A   The number that is in the box, $15,962.42, is
23  generated by their formula.  I was a self-employed
24  borrower at the time.
25     Q   That's not what I'm asking you, sir.  It's a

56

1   really simple question.  Do you recall making this kind
2   of money per month or not?
3       A   I've been paid through RH Brokerage Services.
4   My accountant handles the payments and distributions and
5   W-2 items.
6       Q   Do you recall --
7       A   I don't know specifically if I had a salary or
8   base employment of $15,962.
9       Q   Let's drop down and look at Assets and
10  Liabilities on Page 2 of Exhibit 5.  There's a liability
11  of American United FCU, which I assume means Federal
12  Credit Union, in the amount of --
13      MR. CHRISTENSEN:  (Unintelligible).
14      MR. EGAN:  I'm sorry.  I'm still a novice at
15  this.
16  BY MR. EGAN:
17     Q   Here's where I'm referring to, Mr. Hunt.  I
18  apologize.  There's an unpaid balance to American United
19  FCU of $171,612.  Do you see that?
20     A   Yes.
21     Q   What's that for?
22     A   That was a credit line.
23     Q   Okay.  What's the status of that credit
24  line?
25      MR. CHRISTENSEN:  At the time of the application or

57

1   today?
2       MR. EGAN:  Today.
3       THE WITNESS:  I don't have that credit line.
4   BY MR. EGAN:
5       Q   Did you pay it off?
6       A   I think that was the second attached to the
7   house.
8       Q   But hadn't you already paid that off?
9       A   Yes.  I think that was paid off when the house
10  closed.
11     Q   So why would you list it as a liability if it
12  had already been satisfied?
13     A   All those are prepopulated by the bank.
14     Q   But you signed the agreement, so presumably
15  you reviewed it before you signed it.
16     A   I signed the application that was
17  prepopulated, so I didn't have control of that.
18     Q   You couldn't say I don't owe this money
19  anymore, it's not a liability?
20     A   I may have but I can't recall saying that to
21  the bank.
22     Q   Okay.  Do you recall when you paid off this
23  American United liability?
24     A   The $171,612, like I said, I think it was the
25  second attached to the house.

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 39 of 59

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

---

**58**

1    Q    Below that there is a reference to American
2    United FAMI for $49,230.  Do you see that?
3    A    Yes.
4    Q    What's that for?
5    A    That was a credit line for the company that I
6    was personally guaranteed on, for services that I was
7    personally guaranteed on.
8    Q    There's a Mountain America credit liability of
9    $32,550.  What was that for?
10    A    That was an automobile.  That was an RV
11    loan.
12    Q    Okay.  Let's take a look on the other side of
13    Page 2 where it says, "List checking and savings
14    accounts below, U.S. Bank, $206,407."  Do you see that?
15    A    Yes.
16    Q    What is the source of that $206,000?
17    A    The source would be the sale of the house and
18    other -- proceeds from the house and I think the Lin
19    loan.
20    Q    So the Lin loan is over half of the amount
21    that you're telling the bank you have, correct?
22    A    Correct.
23    Q    Okay.  Let's take a look at the next page.  I
24    want to focus on this part, VII, Details of Transaction.
25    It says the purchase price of the house is $867,886.  Do

---

**59**

1    you see that?
2    A    Yes.
3    Q    Let's see.  The total cost is $873,000 and the
4    loan amount is $694,308.  Do you see that?
5    A    Uh-huh.
6    Q    "Yes"?
7    A    Yes.
8    Q    Then down below, cash from the borrower,
9    $173,372.37.  Do you see that?
10    A    Yes.
11    Q    Okay.  So about two-thirds of the Lin money or
12    perhaps more was used to pay the down payment, was it
13    not?
14    A    I don't know exactly how much of the Lin money
15    was used to make the down payment.
16    Q    They had put $130,000 into your bank account,
17    right?
18    A    Correct.
19    Q    And you're telling the bank that you've got
20    $206,000 in the account.  So the remaining $75,000 plus
21    is your money and the $130,000 is the Lin's money,
22    correct?
23    A    I don't know how much was in the checking
24    account at the time.
25    Q    Well, okay.

---

**60**

1    A    If it was my money versus the Lin loan
2    money.
3    Q    But the Lin loan money was $130,000.  So
4    whatever is left would be your money, correct?
5    A    Yes.
6    Q    Okay.  Let's take a look here at the
7    declarations that you make.  "G" here, "Are you
8    obligated to pay alimony, child support or separate
9    maintenance?"  And you say "No" as the borrower, and
10    then the co-borrower -- I misread that.  Never mind.  My
11    mistake.
12        It's true, is it not, Mr. Hunt, that without
13    the Lins' money you would not have qualified for this
14    loan?
15        MR. CHRISTENSEN:  I'll object.  Calls for
16    speculation.
17        THE WITNESS:  Yeah, I can't recall what the
18    original terms and qualifications were.
19    BY MR. EGAN:
20    Q    But you saw the original terms and
21    qualifications and when you did you asked Dennis Lin for
22    money, correct?
23    A    That was for a different lender.
24    Q    But you still asked him for money, right?
25    A    He offered money in February, around February

---

**61**

1    2017 to help the family.
2    Q    But you asked him --
3    A    I took him up on his offer, okay?
4    Q    If we go back to the details of the
5    transaction, the cash from borrower is $173,000, which
6    we talked about.  And that's pretty close to the
7    $180,000 you represented to the Lins in the June 29th
8    email, correct?
9    A    Yes.
10    Q    Okay.  You would agree, would you not,
11    Mr. Hunt, that the Lins' money -- the Lin loan was for a
12    lot more than optics from the bank, would you not?  You
13    would agree with that, wouldn't you?
14    A    No.
15    Q    Okay.  Why not?
16    A    I didn't know the specific requirements for
17    the loan from U.S. Bank until after I received Dennis's
18    advance.
19    Q    Okay.
20    A    It was a different lender.
21    Q    Well, it was a different lender, but the down
22    payment amount was approximately the same, was it not?
23    A    In the original email that you're referencing?
24    Q    No, I'm talking about -- yes, I am talking
25    about the email.  On June 29th you're saying to the Lins

---

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

---

**62**

1    that you need 180 down and --
2        A    That had nothing to do with the U.S. Bank loan
3    that I received to buy the house.
4        Q    I understand.  But the amount of the U.S. Bank
5    loan down payment was almost exactly the same, wasn't
6    it?
7        A    It was close to the same amount that was
8    referenced in the email.
9        Q    And you don't have any text message or email
10   where you're telling the Lins that the original
11   financing that you were seeking didn't go through for
12   whatever reason and so you have to go to U.S. Bank,
13   right?
14       A    Not that I can recall.
15       Q    You probably told me this, Mr. Hunt, and I
16   forgot or I didn't understand it.  Why did the original
17   financing that you were working on not go through?
18       A    I can't recall.  I don't know that it didn't
19   go through.  It may have just been more expensive.
20       Q    Okay.  If we go back to the transaction
21   details -- bear with me here.  At the top of Page 2, the
22   monthly income and so forth.  As I read this far right
23   column, if you see where I am, the proposed monthly
24   mortgage is going to be $4,561.70.  Do you see that?
25       A    Yes.

---

**63**

1        Q    Where was the money going to come from to pay
2    that?
3        A    Real estate revenue of RH Brokerage.
4        Q    Although you had not been generating any
5    revenue, correct?
6        A    The corporation has generated revenue
7    historically.  I was counting on closing some deals.
8        Q    I've placed before you what's been marked as
9    Exhibit 6.  It's a bank statement from U.S. Bank
10   covering the period July 3rd, 2017 through July 31st.
11       I want to focus on this deposit of July 12th
12   from Tristate Capital to -- sorry -- to RH Brokerage
13   Services, Inc. in the amount of $130,000.  Do you see
14   that?
15       A    Yes.
16       Q    I'm just confirming that that's the Lin loan.
17       A    Yes.
18       Q    Okay.  Is there a reason why you sent it to RH
19   Brokerage Services as opposed to you personally?
20       A    Yes.
21       Q    What was that?
22       A    Because Dennis and Alisha told me that they
23   were going to pay RH Brokerage Services once they closed
24   their condominium sale.  So that would have been
25   recognized as revenue and could have offset that

---

**64**

1    amount.
2        Q    Okay.  I'm begging your indulgence, Mr. Hunt.
3    I just want to check something out.
4        How long did you live in Irvine?
5        A    We were in Irvine for about nine months or so,
6    nine or ten months.
7        Q    What caused you to leave?
8        MR. CHRISTENSEN:  You turned the camera off.
9        MR. EGAN:  I didn't mean to.  Let me start it
10   again.  There I am.
11       MR. CHRISTENSEN:  There you go.
12   BY MR. EGAN:
13       Q    What prompted you to leave?
14       A    The community.
15       Q    Specifically?
16       A    It wasn't the right fit for our children, my
17   wife and myself.
18       Q    How did you come to move to Boise as opposed
19   to some other place?
20       A    I was talking to my aunt and she had lived
21   there for a long time and said it was a nice place to
22   live.  They had a good sense of community.
23       Q    Okay.  Do you recall specifically when you
24   moved to Boise?
25       A    In May 2018.

---

**65**

1        Q    Mr. Hunt, I've placed before you what's been
2    marked as Exhibit 7.  I'll represent to you that it's
3    another residential loan application, this time for the
4    property on Mill Site Lane in Boise.  I'm just going to
5    scroll through it and ask you if you've ever seen this
6    document.  That's your signature, right?
7        A    Yes.
8        Q    And you signed this on or about May 16th,
9    2018, correct?
10       A    Yes.
11       Q    I want to go back to the first page.  It
12   indicates that you're purchasing the home -- that the
13   loan amount, rather, is for $444,600.  Do you see
14   that?
15       A    Yes.
16       Q    Let me come about it this way.  Let me turn to
17   the third page.  This might be more efficient.  This is
18   the transaction detail section.  It indicates that the
19   purchase price of the house was $468,000.  Do you see
20   that?
21       A    Yes.
22       Q    The loan, as we indicated, was for $444,600,
23   meaning that the cash from the borrower would be
24   $26,138.  Do you see that?
25       A    Yes.

---

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

---

66

1  Q   Where was the money coming from to make that
2  payment?
3  A   The sale of the other house.
4  Q   How much did the house in Irvine sell for?
5  A   Approximately 930.
6  Q   So there was a gain, correct?
7  A   Yes.
8  Q   What did you do with the proceeds of that
9  gain?
10  A   Spent it on living expenses and a deposit for
11  the house.
12  Q   If we turn to the second page of Exhibit 7,
13  there's a reference here again to gross monthly income
14  and it appears to me to be the exact same number we were
15  talking about in the earlier exhibit, I think it's
16  Exhibit 5.  Do you see that?
17  A   Yes.
18  Q   If we scroll down here and look at the
19  checking and savings account information, it indicates
20  that you've got $61,000 in your bank accounts with U.S.
21  Bank, correct?
22  A   Yes.
23  Q   Okay.  Where was the Lin money?
24  A   What do you mean where was the --
25  Q   It had been spent, had it not?  The money that

---

67

1  the Lins advanced to you had been spent.  Do you
2  agree?
3  A   On living expenses, for the kids and myself
4  and my wife.
5  Q   The liabilities here are listed as -- there's
6  American United FAMI, $43,509, and the Mountain America
7  credit liabilities.
8      Looking at this now on an application dated in
9  May 2018, does this affect your recollection about what
10  this American United liability is?
11  A   Like I said, the other one was a larger
12  amount.  The second had been paid off, so that would be
13  updated.  The 43 was the American United/RH Brokerage
14  line that I was personally obligated to.  Mountain
15  America was the loan -- that's an auto loan, I think,
16  this 790 for the truck I had.  Mountain America was the
17  RV.
18  Q   Let's take a look at the first page of Exhibit
19  7.  You've got here -- never mind.  I think we've
20  covered that.
21      The grossly month income is $15,962.  I'm
22  gathering from our earlier exchanges about this you
23  don't know where that number came from; is that fair?
24  A   The bank calculates that income for
25  self-employed borrowers.

---

68

1  Q   The asterisk just says, "Self-employed
2  borrower may be required to provided additional
3  documentation, such as tax returns and financial
4  statements."  That's all that says.
5  A   Whatever they required I gave them.
6  Q   Mr. Hunt, I'm placing before you on the screen
7  what's been marked as Exhibit 8.  It's the tax returns
8  for 2018.  I'll represent to you this is how they were
9  produced to me.  It starts at DEF 50 and it runs through
10  DEF 87, so they came from you.
11      It indicates here on Page 2, wages and
12  salaries, et cetera of $20,000, and then taxable income
13  on Line 10 of $132,000.  Do you see that?
14  A   Yes.
15  Q   Do you know where that income came from?
16  A   In 2018?
17  Q   Yeah.
18  A   It's part of the transactions, I think, some
19  acquisitions that I brokered.
20  Q   Okay.  If we look at Line 7, the adjusted
21  gross income is $190,000.  Do you see that?
22  A   Yes.
23  Q   Do you have a sense as you sit here today of
24  the timing for when you received that money?  Was it the
25  beginning of the year, end of the year, consistently

---

69

1  throughout?
2  A   Third and fourth quarters, most of it, I
3  think.
4  Q   At that point did it occur to you to attempt
5  to make payments to the Lins to pay down some of your
6  borrowing from them?
7  A   I tried.  I sent an email to see if Dennis was
8  going to offset the money that they owed on their condo
9  transaction that they represented they'd pay me numerous
10  times over the phone and he responded with an email, and
11  then after that he sued me.
12  Q   Do you have any documentation indicating that
13  the money you were claiming entitlement to was part of
14  the borrowing that you made from the Lins?
15  MR. CHRISTENSEN:  I'll object to the form.
16  MR. EGAN:  I'll try it again.
17  THE WITNESS:  Not specifically, Sean, but numerous
18  times over the course of about a year that I advised
19  them on the sale of their condo Alisha and Dennis
20  indicated that they would pay me once the contract
21  closed.  Because the ineptitude of the current agents
22  that they had employed through an agency agreement was
23  very poor, I was advising them throughout the term of
24  the process that they sold their condo.  On numerous
25  calls they told me they appreciated the help, that I'm

---

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 42 of 59

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

---

**70**

1  the best and they would pay me once it closes. So I
2  said okay, great, thank you. So that was my
3  expectation. So it was a verbal arrangement over the
4  phone. Multiple phone calls stipulated the same thing,
5  that once the condo closed they would pay me.
6  BY MR. EGAN:
7      Q    When did the --
8      A    It closed September 2017, I think.
9      Q    Okay. But you didn't have any kind of listing
10  agreement or seller's agreement with the Lins, right?
11      A    No, it was a verbal friend agreement, just
12  like the money that they sent me. My expectation was I
13  was going to get paid when it closed. When it closed I
14  never got paid.
15      Q    How much do you contend they owe?
16      A    They indicated a percentage. We talked about
17  what do we owe you. I said generally it's two percent.
18  That's fine, okay, great. So on their transaction it
19  would be -- my expectation was about two percent of the
20  gross purchase price.
21      Q    Okay. Is it proper under the rules guiding
22  real estate brokers to accept commissions that are not
23  predicated on a written agreement?
24      A    If you're not listing a property, if it's a
25  referral, generally you would see that the client -- if

---

**71**

1  they're telling you something, you generally honor their
2  word.
3      Q    Okay. It sounds to me like you believe you've
4  got some kind of claim against the Lins. Am I hearing
5  you correctly?
6      A    I don't know that it's a claim. I would
7  assume it would be some kind of offset.
8      Q    Well, did you list this claim or offset on
9  your schedule in your bankruptcy?
10      A    No. It wasn't in writing.
11      Q    Answering "yes" or "no" only, did you discuss
12  this potential claim with Mr. Christensen?
13      A    Yes. I've been drinking too much water, Sean.
14  I need to use the restroom again, okay?
15      Q    That's fine.
16      A    Give me five.
17      Q    I would suggest a ten-minute break because I
18  think I can wrap up, so let's do that.
19      A    Okay. Thank you.
20
21          (Off the record.)
22
23  BY MR. EGAN:
24      Q    Just a little bit more, Mr. Hunt.
25          I want to go back to Exhibit 5. No, strike

---

**72**

1  that. Exhibit 7. That is the second residential loan
2  application. This is for the Mill Site Lane home, which
3  we established was filled out in May of 2018.
4          Mr. Hunt, you don't list in your liability
5  section -- I'm scrolling through here. You don't list
6  the Lins' loan, do you?
7      A    No.
8      Q    But you knew at this point that the Lins were
9  upset that you had not paid them back, correct?
10      A    No.
11      Q    Hadn't you had communications with them in the
12  months prior to filling out this application where they
13  demanded that you pay?
14      A    No, there was no demand to pay. I had good
15  conversations with Dennis and Alisha.
16      Q    Okay. So there are no documents where you're
17  indicating that you aren't able to pay what they're owed
18  prior to May of 2018?
19      A    Not that I can recall. I had numerous phone
20  conversations.
21      Q    Okay. My question is why didn't you list the
22  Lin loan as a liability in this Mill Site Lane loan
23  application?
24      A    Because it was a corporate liability. The
25  money was sent to RH Brokerage Services.

---

**73**

1      Q    Did you ever take that position that the Hunts
2  themselves did not -- that you and your wife did not owe
3  the $130,000 personally but in fact RH Brokerage owed
4  it?
5      A    Yes.
6      Q    You took that --
7      A    I always treated it that way. It was a loan
8  to the company. That's where the money went. Money was
9  wired to the corporate account.
10      Q    And used by you?
11      A    Yeah, as an officer of RH Brokerage Services.
12  The money was then directed to its agents, employees and
13  others to use for personal purposes.
14      Q    So in the lawsuit that the Lins filed against
15  you in State Court, did you ever assert that as a
16  defense to their claim of breach of contract?
17      A    I can't recall.
18      Q    In the motions or affidavits that you filed in
19  connection with that State Court litigation, did you
20  ever represent under oath that the loan was not made to
21  you personally but was rather made to RH Brokerage
22  Services, Inc.?
23      A    I can't recall.
24      Q    But your testimony today as I understand it
25  under oath is that you didn't list this obligation to

---

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 43 of 59

LIN vs HUNT
Rinaldo Hunt

January 12, 2021

74

1  the Lins on your loan application to purchase the Mill
2  Site Lane home because you regarded it as a corporate
3  liability, correct?
4      A   Correct.
5      Q   Now did you list this loan as a liability in
6  your bankruptcy schedules?
7      A   I can't recall.  There was a lot of
8  information in those schedules.
9      Q   I'm just asking what you remember.  You did
10 sign those schedules under penalty of perjury, right?
11     A   Yes, the loan was on the schedule.  That's why
12 we're here today.
13     Q   I'm just making sure -- you understood that
14 when you signed the schedules you were making a
15 representation to the court, right?
16     A   Yes.
17     Q   Okay.  And --
18     A   I take that seriously.
19     Q   I'm sure that you do.  My question then is the
20 representation you made to the court was that your
21 liability to the Lins was a personal obligation,
22 right?
23     MR. CHRISTENSEN:  I'll object.  It mischaracterizes
24 what's on the schedules.
25     THE WITNESS:  The Lins sued me personally for the

75

1  money.
2  BY MR. EGAN:
3      Q   I understand.  And they got a judgement
4  against you too.
5      A   Correct.
6      MR. CHRISTENSEN:  That's not listed on the schedule
7  as a loan.  It's listed as a judgement.
8      MR. EGAN:  Okay, Mr. Hunt.  Subject to anything
9  that Mr. Christensen might ask you, I don't have
10 anything further.  Thank you
11     MR. CHRISTENSEN:  I don't have any questions
12 either.
13
14 (End of deposition.  Declaration under penalty of
15 perjury is attached hereto.)
16
17
18
19
20
21
22
23
24
25

76

1                 REPORTER'S CERTIFICATION
2
3  STATE OF UTAH        )
4  COUNTY OF SALT LAKE )
5
6          This is to certify that the deposition of
7  RINALDO HUNT was taken before me, Toni Bertini, a
8  Registered Professional Reporter in and for the State of
9  Utah.
10         That the said witness was by me, before
11 examination, duly sworn to testify the truth, the whole
12 truth, and nothing but the truth in said cause.
13         That the testimony was reported by me in
14 stenotype, and thereafter transcribed by my computer
15 under my supervision, and that a full, true and correct
16 transcription is set forth in the foregoing pages,
17 numbered 1 through 75 inclusive.
18         I further certify that I am not of kin or
19 otherwise associated with any of the parties to said
20 cause of action and that I am not interested in the
21 events thereof.
22         Witness my hand this 19th day of January,
23 2021.
24
25         Toni Bertini, CSR, RPR

77

1                 W-I-T-N-E-S-S
2         C-E-R-T-I-F-I-C-A-T-I-O-N
3
4          I do solemnly declare under penalty of perjury
5  under the laws of the State of Utah that the foregoing
6  is my deposition under oath; are the questions asked of
7  me and my answers thereto; that I have read same and
8  have made the necessary corrections, additions or
9  changes to my answers that I deem necessary.
10
11
12 Executed this _____ day of _____, _____.
13
14         _____
15                 Signature of Witness
16
17
18
19
20
21
22
23
24
25

EXHIBIT D

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | | |
|---|---|---|
| In re: | ) | |
| RINALDO AND MAILE HUNT, | ) | Bankr. Case No: |
|           Debtors. | ) | 20-00137-JDP |
| _____ | ) | |
| ALISHA LIN, an individual and DENNIS | ) | |
| LIN, an individual, | ) | |
|           Plaintiffs, | ) | Adv. Case No. |
| vs. | ) | 20-06015-JDP |
| RINALDO HUNT, an individual and MAILE | ) | |
| HUNT, an individual, | ) | |
|           Defendants. | ) | |
| _____ | ) | |

DEPOSITION OF DENNIS LIN

JANUARY 19, 2021

REPORTED REMOTELY BY:

MARLENE "MOLLY" WARD, CSR No. 704, RPR

Notary Public

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 46 of 59

Dennis Lin
January 19, 2021

Page 2

1          THE DEPOSITION OF DENNIS LIN was taken on
2 behalf of the Defendants via remote videoconference,
3 commencing at 9:04 a.m. on January 19, 2021, before
4 Marlene "Molly" Ward, Registered Professional Reporter
5 and Notary Public within and for the State of Idaho, in
6 the above-entitled matter.
7
8                    APPEARANCES:
9   For the Plaintiffs:
10          (Present Remotely)
11          Sean Egan Law Office
12          BY:  MR. SEAN N. EGAN
13          136 East South Temple, Suite 1505
14          Salt Lake City, Utah  84111-1152
15          seannegan@sneganlaw.com
16
17  For the Defendants:
18          (Present Remotely)
19          Angstman Johnson
20          BY:  MR. MATTHEW T. CHRISTENSEN
21          199 North Capitol Boulevard, Suite 200
22          Boise, Idaho  83702
23          mtc@angstman.com
24
25 ALSO PRESENT REMOTELY:  Rinaldo & Maile Hunt, Alisha Lin

Page 3

1                  I N D E X
2 TESTIMONY OF DENNIS LIN                         PAGE
3 Examination by Mr. Christensen                     5
4 Examination by Mr. Egan                           47
5 Further Examination by Mr. Christensen            49
6
7              NO EXHIBITS MARKED
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          COURT REPORTER: The attorneys participating in
2 this proceeding acknowledge that I am not physically
3 present in the proceeding room and that I will be
4 reporting this proceeding remotely.  They further
5 acknowledge that the witness will be sworn in remotely
6 by me and that the testimony will have the same force
7 and effect under the rules as an in-person deposition.
8 The parties and their counsel consent to this
9 arrangement and waive any objections to this manner of
10 reporting.  Please indicate your agreement by stating
11 your name and your agreement on the record.  Also, if
12 there is anyone present in the room with you not on
13 video, please so indicate.
14          MR. EGAN: Sean Egan on behalf of Dennis Lin.
15 I stipulate to the court reporter's statement.  And I
16 indicate for the record that Alisha Lin is attending
17 this deposition, but she's not in the same room as the
18 deponent.
19          MR. CHRISTENSEN: I'm Matt Christensen on
20 behalf of the Hunts.  I agree with the court reporter's
21 statement and note that both Maile and Rinaldo Hunt are
22 attending the deposition.  They're in a room together,
23 but it's a separate room from where I am or where the
24 deponent is as well.
25          COURT REPORTER: Please raise your right hand,

Page 5

1 sir.
2
3          DENNIS LIN,
4 first duly sworn to tell the truth relating to said
5 cause, testified remotely as follows:
6
7              EXAMINATION
8 QUESTIONS BY MR. CHRISTENSEN:
9      Q.  Good morning, Mr. Lin.  My name is Matt
10 Christensen.  As I just stated, I represent the Hunts; I
11 think you already understand that in the
12 nondischargeability litigation.  The deposition is being
13 taken in that case.
14          Can you state your name for the record and
15 spell it as well.
16      A.  Yep.  It's Dennis Lin, D-e-n-n-i-s, last name
17 Lin, L-i-n.
18      Q.  And Mr. Lin, what's your current address?
19      A.  It is 2011 Hampton Ridge Ogden, Utah 84403.
20      Q.  Mr. Lin, have you been deposed before?
21      A.  Never.
22      Q.  Okay.  So I'm just going to go over some, what
23 I call, rules for depositions that are really made to
24 make sure it goes smoothly and we don't run into too
25 many issues.  First off, there's a court reporter taking

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 47 of 59

Dennis Lin
January 19, 2021

Page 6

1  down everything that you and I say, so -- and you just
2  took an oath to tell the truth, we expect that to
3  happen -- she's going to write everything down. Because
4  the court reporter is involved, it really helps if you
5  and I don't speak over each other. Especially in a Zoom
6  environment when two people are speaking that means no
7  one can understand anybody, and we're all kind of
8  getting used to that situation.
9      So the first thing I would ask is let me
10 finish the question before you start an answer, and I'll
11 try and do the same, let you finish your answer before I
12 start a new question. Does that make sense?
13     A. Yes. So I apologize if there's any snafus,
14 but this is my first deposition and my second Zoom call
15 ever, so . . .
16     Q. I'll apologize in advance, too. This is not
17 my first deposition, and I still make that mistake, so
18 we'll kind of watch out for each other I think.
19     A. Thank you.
20     Q. Next if you answer a question, we'll assume
21 that you understood the question. So if you don't
22 understand a question or for some reason there's some
23 Zoom issue, technology issue, please let us know, and I
24 can restate the question.
25     I don't really expect we're going to go super

Page 7

1  long, but if we get going and you need to take a break,
2  that's fine, just let us know. The only thing we would
3  request is that if there's a question that's been asked
4  that hasn't been answered yet, that you answer that
5  question before we take the break.
6      A. Absolutely.
7      Q. Do you understand that?
8      A. Yes.
9      Q. Okay. Another thing is if there's a question
10 that you may want to answer by just nodding your head or
11 shaking your head no, I may follow up with that to make
12 sure it's a "yes" or a "no," mostly for purposes of
13 keeping the record clear. It's not because I'm
14 questioning that you were nodding your head, I'm just
15 trying to make sure we have an audible answer. Okay?
16     A. Understood. Thanks.
17     Q. Are you under the influence of any sort of
18 medication or other substance that would affect your
19 ability to testify truthfully today? Is that a "no"?
20     A. No.
21     Q. Can you just kind of briefly walk me through
22 your educational background?
23     A. Sure. I grew up in Northern California, and
24 after high school I moved to the East Coast, and I
25 attended Yale University from 1994 to 1998 with a BA in

Page 8

1  economics.
2      Q. Once you got that degree from Yale, did you
3  pursue further education?
4      A. No, I went directly to work.
5      Q. Okay. Is there any, sort of, like
6  certifications or accreditations or those sorts of
7  things that you had to go through some educational
8  training for?
9      A. Sure. I had some registrations for
10 securities, Series 7, Series 63, Series 24, and I think
11 a Series 3 securities registrations.
12     Q. Can you now walk me through -- so did you have
13 any sort of significant employment between graduating
14 high school and graduating college?
15     A. I worked as an intern at the Goldman Sachs
16 between the years of 1996 and 1998 for the summers.
17     Q. And that would have been while finishing
18 college?
19     A. Yes.
20     Q. Okay. And once you graduated in 1998, walk me
21 through your work history after that point.
22     A. I went to work for JPMorgan until 2000, and
23 then I worked for Credit Suisse till 2010.
24     Q. So Credit Suisse you would have been there
25 from 2000 to 2010?

Page 9

1      A. Yes.
2      Q. What did you do after that?
3      A. I started my own company with two business
4  partners in San Francisco which was related to --
5  management.
6      COURT REPORTER: What was the management?
7      THE WITNESS: Investment management -- excuse
8  me, I'm getting used to this.
9      Q. (BY MR. CHRISTENSEN) And what was the name of
10 that company again? I couldn't quite hear it.
11     A. Varden Pacific LP.
12     Q. Far End Pacific?
13     A. Varden, V-a-r-d-e-n, Pacific LP.
14     Q. While you were at JPMorgan what was your job
15 title there? Well, your job title and what sorts of
16 things did you do?
17     A. Investment analyst, analyzing investments.
18     Q. And same question while at Credit Suisse,
19 titles and job duties?
20     A. I believe I started as an associate. And when
21 I left credit Suisse I was global head of --
22     COURT REPORTER: I'm sorry, say that one more
23 time.
24     THE WITNESS: Yep, no problem. I was global
25 head of interest rate stock trading for U.S. dollars.

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 48 of 59

Dennis Lin
January 19, 2021

Page 10

1    MR. EGAN: Dennis, it may help you if you sit
2  forward that close, because when you just spoke that was
3  very clear.
4    THE WITNESS: Okay. Sorry. I guess this
5  microphone on this computer is not great, I apologize.
6  Is that better?
7    COURT REPORTER: Yes.
8    MR. EGAN: That is better. If it's
9  comfortable for you, that is better. Thank you.
10    THE WITNESS: Is there a button on Zoom where
11  I can actually increase my microphone sensitivity,
12  perhaps?
13    COURT REPORTER: Yes.
14    Matt, can we go off the record?
15    MR. CHRISTENSEN: Yes.
16    (Discussion.)
17    MR. CHRISTENSEN: Back on the record.
18    Q. (BY MR. CHRISTENSEN) In the current company
19  of Varden Pacific, can you tell me what sorts of things
20  you do for that company?
21    A. I am the chief operating officer and a
22  founding partner.
23    Q. As chief operating officer, what are your job
24  duties?
25    A. Day-to-day operations, making sure the whole

Page 11

1  company is running and all the departments are running
2  and functioning properly.
3    Q. Would you be doing the same sort of analysis
4  that you did at, like, JPMorgan?
5    A. Slightly different. More of running a company
6  as opposed to working for a company.
7    Q. Okay. Are you involved in approving
8  investments for the company?
9    A. I'm on the investment committee, but only in
10  the respect that I make sure that the investments are
11  within the investments guidelines and the investment
12  strategy of the company.
13    Q. And in reviewing that I assume you're
14  reviewing like a report that some analyst has done and
15  presented to you. Is that fair to say?
16    A. That would probably be the job of our CIO, the
17  chief investment officer. My role within investments
18  would primarily be in approving and making sure that the
19  investments are within the guidelines of our operating
20  managers.
21    Q. Okay. Does the company -- the company makes
22  investments, correct?
23    A. Correct.
24    Q. Does it also have investors who have invested
25  in the company itself?

Page 12

1    A. Not in the company itself, but they are
2  invested in a fund which we -- our investment managers
3  run.
4    Q. Okay. Do you have any function in the process
5  of getting investors --
6    A. I am not.
7    Q. -- to those funds?
8    A. I am not. That would be our head of business
9  development.
10    Q. Do you have any function in the approval of
11  those investors?
12    A. Yes. I have the right to definitely reject an
13  investor.
14    Q. What are some of the reasons you would reject
15  an investor?
16    A. If they're not qualified, there are certain
17  parameters to invest in a -- in a private company. It's
18  not a public security, so they have to be accredited,
19  they have to be what's called a qualified purchaser or
20  qp. So there are definitely legal guidelines that would
21  allow them to be eligible for investing in a private
22  company.
23    Q. Okay. And, again, if you're reviewing a
24  potential investor, you, yourself, are not the one
25  necessarily, doing all the analysis of whether they're a

Page 13

1  qualified investor; you'd be relying on someone else to
2  do that sort of analysis, correct?
3    A. We do rely on some service providers, yes.
4  Things such as --
5    COURT REPORTER: Sorry, say that again? Can
6    you scoot up?
7    THE WITNESS: Yep.
8    Yeah, we definitely rely on other service
9  providers to help us vet properly a potential investor.
10    Q. (BY MR. CHRISTENSEN) Generally speaking, what
11  are the types of investments that that company would
12  make?
13    A. They're in a very niche product of corporate
14  credit.
15    Q. Can you describe what you mean by "corporate
16  credit"?
17    A. Is this relevant to the conversation?
18    Q. Is it loans to corporations?
19    A. We are not, ourselves, loaning corporations.
20    Q. Okay.
21    A. But our securities that we do invest in our
22  corporate credit base.
23    Q. Meaning what? What does corporate credit base
24  mean?
25    A. They're based on the credits of corporations.

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 49 of 59

In Re: Rinaldo and Maile Hunt

Dennis Lin
January 19, 2021

Page 14

1  Q. So are you infusing money into other
2  corporations?
3  A. No. We are investing pools of corporate
4  credit which are based on CDS contracts, which are
5  credit derivative securities.
6  Q. So the pools of corporate credit that you
7  invest in, what happens with those pools? What are
8  those pools of funds used for?
9  A. For investments. I mean, I don't know what
10  the question is.
11  Q. What type of investments? Are they buying
12  companies, or are they buying land? Are they making
13  loans to companies?
14  A. They are buying pools of ISDA based derivative
15  contracts that are pools of corporate credit based on --
16  it's a very niche product.
17  Q. Okay. I'm just trying to understand what the
18  product actually is.
19  A. It's a very unique sophisticated product that
20  is not available to retail investment.
21  Q. I assume there's fairly sophisticated
22  investment documents to invest in that sort of thing; is
23  that correct?
24  A. Yes.
25  Q. How did you first meet the Hunts?

Page 15

1  A. Me and my wife purchased a condo in Park City
2  where Rinaldo Hunt was the --
3  COURT REPORTER: Was the what?
4  THE WITNESS: Developer.
5  Q. (BY MR. CHRISTENSEN) How did you meet
6  Rinaldo?
7  A. I feel like we met him through -- it was a new
8  development, we met him through the walkthrough, and
9  we just went from there in terms of we seemed to like
10  each other, and we gained a friendship from that.
11  Q. You said that development -- or that -- yeah,
12  that development was in Park City, correct?
13  A. That's correct.
14  Q. Were you living in Ogden at that time and this
15  was like a second home or a . . .
16  A. Yes.
17  Q. Okay. So after that first meeting, how did
18  the relationship develop after that? What kind of
19  things did you do?
20  A. I mean, I think it was pretty mutual. We
21  seemed to get along. We then met his wife and, you
22  know, we met his family, and we became good friends.
23  Q. Okay. Did you -- you had dinners together?
24  A. Yes.
25  Q. Was it at each other's home?

Page 16

1  A. Yes. And primarily he was inviting us to his
2  home.
3  Q. Would the Hunts come to your home?
4  A. Yes. Less frequently, but they have.
5  Q. Okay. Were there trips that you took
6  together?
7  A. Yes.
8  Q. Do you remember when it was that you first met
9  Rinaldo?
10  A. I don't remember the exact date, but probably
11  somewhere in 2015 when the development was finishing up.
12  Q. Okay. You said 2015, right?
13  A. I believe '15 or early '16, I don't remember
14  the exact dates.
15  Q. Okay. And at that point you had already
16  started your own company with Varden Pacific, right?
17  That was several years into that?
18  A. Yes.
19  Q. I'm sorry if you already talked about this,
20  but you mentioned being the chief operating officer and
21  a partner of that company. Have you had other roles in
22  the past besides those?
23  A. Nope --
24  Q. So --
25  A. -- I have not.

Page 17

1  Q. -- from the -- from the beginning you were the
2  COO and a partner?
3  A. Yes.
4  Q. How did the issue of you making a loan to the
5  Hunts first come up?
6  A. Rinaldo has always made himself out to be a
7  very successful and wealthy developer with comparable
8  financial security. You know, he said that he made
9  somewhere about 5- to $600,000 a year. And he picked up
10  large tabs, took a lot of luxury vacations. And he
11  misrepresented himself, I believe, where he said that he
12  had tons of assets, but that he needed a bridge loan
13  because a lot of his assets were illiquid and he needed
14  a bridge loan to optics because he needed cash in his
15  checking account. So that is initially how he brought
16  up the rental bridge loan.
17  Q. Was he the one that asked you for a loan --
18  A. 100 percent.
19  Q. -- or did you offer to make a loan?
20  A. No. I wouldn't have offered to make a loan
21  because I thought he was -- he, you know, displayed
22  himself -- misrepresented himself as -- as being
23  wealthy, like had a lot of assets, so it actually
24  surprised me.
25  Q. So you didn't offer to help them with the

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 50 of 59

Dennis Lin
January 19, 2021

Page 18

1  house financing yourself?
2      A. I did not.
3      Q. And you never offered as much as 250,000 to be
4  loaned to them?
5          I couldn't hear that.
6      A. I did not.
7      Q. When did he first come to you about a loan --
8  or when was the loan first discussed?
9      A. I would say probably in April when -- in April
10  of 2017, I believe, when we were in Arizona, and he was
11  discussing the possibility that he would not be able to
12  liquidate assets in time in order to show --
13         COURT REPORTER: To show what?
14         THE WITNESS: His words were optics for the
15  bank in order to secure a good rate and to eliminate any
16  potential extra underwriting.
17      Q. (BY MR. CHRISTENSEN) And that was during a
18  conversation in Arizona?
19      A. I believe that is the first time he brought it
20  up, yes.
21      Q. Okay. And isn't it true that you were the
22  first one to use the word "optics" not Rinaldo?
23      A. Absolutely incorrect.
24      Q. You believe he was the first one to bring that
25  up?

Page 19

1      A. Yes.
2      Q. Okay.
3      A. Because I thought he was a man with a lot of
4  assets that just needed a bridge loan because he had
5  a --
6          COURT REPORTER: You're going to have to scoot
7  up to the screen from here on out because you're just
8  too faint.
9          THE WITNESS: Sorry about that.
10         Where did you need me to --
11         COURT REPORTER: "I thought he was a man with
12  a lot of assets that just needed a bridge loan because
13  he had a . . ."
14         THE WITNESS: Timing of cash flow his issue
15  where didn't have the actual cash within his checking
16  account, but he had plenty of assets.
17      Q. (BY MR. CHRISTENSEN) In the complaint in this
18  case you've alleged that Rinaldo said he would return
19  your money within 60 days after closing.
20         Can you tell me where or when that statement
21  was made?
22      A. Actually, that was made several times in all
23  of the, you know, written documentation that you may
24  have and all the verbal communication. And I even
25  believe that we have a summary judgment based on all

Page 20

1  that written documentation.
2      Q. So I have not seen a 60-day reference in any
3  of that written documentation. That's what I'm looking
4  for is: Where was that actually said?
5      A. That was said in our -- a lot of emails, I
6  believe in a text message from June 5th, I believe, that
7  we would have it shortly after the close. And also in
8  emails referenced in early June -- in early July where
9  he says he needed to just prove out assets and that he
10  needed 60 days to season the fund.
11      Q. And that's 60 days to season the funds
12  prior to closing, correct?
13      A. Yes.
14      Q. So there's nowhere that actually says "60 days
15  after closing," correct?
16      A. I do not know. You'll have to ask my legal
17  counsel.
18      Q. Did you ever ask the Hunts for a written
19  financial statement before making the loan?
20      A. No. I feel like I had enough written
21  testimony -- or written proof that what they asked for,
22  which I believe the summary judgment also relied on all
23  his -- all of the written documentation.
24      Q. Okay. But you never said, "Hey, can you fill
25  out a loan application for me"?

Page 21

1      A. No. I'm not a consumer lender. I do not
2  have --
3      Q. Did you ever ask for --
4          COURT REPORTER: Whoa.
5          THE WITNESS: I've never made a consumer loan
6  before, so I do not have that documentation on him.
7      Q. (BY MR. CHRISTENSEN) You don't have that
8  documentation at all, right?
9      A. I do. It's -- I have written proof that --
10  what he asked for in written text messages and emails
11  where he misrepresented himself, he said that he needed
12  a bridge loan for optics, that he needed majority -- I
13  would get the majority of my money back shortly after
14  the close, and that he even had, you know, two deals
15  closing early in 2-4, which we know now is false, that
16  was supposed to give me additional comfort for optics.
17  So it meant to reassure me that I was going to get my
18  money back quickly and there was a short-term equity
19  issue alone.
20      Q. But you'll agree there is no written financial
21  statement depicting the finances of the Hunts that you
22  ever received before making that loan, correct?
23      A. I did not personally receive any
24  documentation.
25      Q. Okay. Did you ask if the Hunts had filed

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
In Re: Rinaldo and Maile Hunt        Declaration of Matthew T. Christensen    Page 51 of 59

Dennis Lin
January 19, 2021

Page 22

1   bankruptcy prior to making the loan?
2       A.  I did not ask that.
3       Q.  Okay.
4       A.  But he misrepresented himself as a wealthy and
5   successful developer, and there would never be any
6   indication that he was ever in financial trouble.
7       Q.  Other than the emails and the texts that
8   you've referenced, did you ask for or get any documents
9   from the Hunts prior to making them a loan?
10      A.  I do not believe I did.  But I do have emails
11  from Rinaldo from April of 2016, I believe, where he
12  represents that he consistently had made 5- to $600,000
13  a year and that he was not willing to take a pay cut.
14      Q.  And you said those emails were from April of
15  2016?
16      A.  Yes.
17      Q.  Did you mean April of 2017?
18      A.  No.  He has -- he has misrepresented himself
19  from the start, from the very beginning since we've
20  known him, and we've relied on his misrepresentations
21  throughout this bridge loan, and it has cost us
22  significantly.
23      Q.  When you made the loan to the Hunts, did you
24  impose any restrictions on what they could use the money
25  for?

Page 23

1       A.  Yes.
2       Q.  Are those in writing?
3       A.  Yes.
4       Q.  Where?
5       A.  He says in text messages, saying this is
6   purely for optics, you'll have the money back shortly
7   and that he is purely using this for optics and that is
8   a bridge loan.  I never -- there's no verbal, nor
9   written information that says anything about him being
10  able to use the money for anything except for his optics
11  and for a bridge loan, his words.
12      Q.  And there's also nothing in writing that says
13  they can't use it for something else, correct?
14      A.  I am not sure that, potentially, it could have
15  been, but I'll have to review the documents.
16      Q.  You're not aware of anything today that
17  restricts them from using the funds for something else,
18  right?
19      A.  I am.  All his text messages and emails point
20  to using the funds for optics for a bridge loan rely --
21  and we relied on misrepresentations that he made in
22  writing and verbally that he was using this purely as
23  optics and for a bridge loan to get him through a extra
24  under -- underwriting situation as well as to get
25  secure, in his words, a better rate.

Page 24

1       Q.  Those are all statements from Mr. Hunt,
2   correct?
3       A.  Correct.
4       Q.  There's no statement from you backing him
5   saying that he's otherwise restricted from using those
6   funds for something else, correct?
7       A.  I don't think I need to positively confirm
8   that he can't use it when he said he would use them only
9   for optics.
10      Q.  So the answer is "no," there's no other
11  statements from you in writing, back to him, restricting
12  the use of the funds, right?
13          MR. EGAN:  Asked and answered and
14  argumentative.
15      Q.  (BY MR. CHRISTENSEN)  Go ahead and answer.
16      A.  Am I supposed to answer?
17      Q.  Yes.
18          MR. EGAN:  Yeah, go ahead.
19          THE WITNESS:  Yes.  I believe there were
20  actually text messages that I wrote back where I was
21  actually asking him and very concerned about the use of
22  funds, if you see the text message chain where I'm very
23  concerned that is he lying, at home, that he cannot
24  afford.  And you'll see that I am not okay with him just
25  using my money, and that there's a certain cost to me

Page 25

1   for making him that loan.
2       Q.  (BY MR. CHRISTENSEN)  And those texts are the
3   ones attached to the complaint in this case, right?
4       A.  Yes.
5       Q.  Okay.  When was the loan made?
6       A.  It was in July.
7       Q.  Of 2017?
8       A.  Of 2017.
9       Q.  Okay.  And how were the funds sent?
10      A.  Wire transfer.
11      Q.  Who initiated the wire transfer?
12      A.  I initiated the wire transfer.
13      Q.  Would you have been the one, then, to input
14  who the beneficiary for the wire transfer is?
15      A.  Yes.
16      Q.  Do you recall, for this loan, who the
17  beneficiary was that was listed on the wire transfer?
18      A.  I do not, but it was in the email where he
19  states that he needed this in his personal checking
20  account and then -- immediately so that he could season
21  the funds in his personal checking account.  And then
22  below that he listed just an ABA routing number and an
23  account number.
24      Q.  Okay.  Are you familiar with the following
25  address 3143 West Laurelhurst Drive Northeast Seattle

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 52 of 59

Dennis Lin
January 19, 2021

Page 26

1  Washington 98105?
2      A. Yes.
3      Q. What is that address?
4      A. That is the address of my business partner.
5      Q. Has Mr. Hunt or Mrs. Hunt ever resided at that
6  address?
7      A. No.
8      Q. Has any of their businesses ever been located
9  at that address?
10     A. No.
11     Q. Do you know why that address was used on the
12 beneficiary line for the wire transfer?
13     A. Yes. He's my business partner.
14     Q. Why would that address be listed for the
15 beneficiary of the wire transfer?
16     A. For the beneficiary?
17     Q. Yep.
18     A. I don't know. I -- he was the initiator, but
19 he was not the beneficiary, it should have been Rinaldo
20 Hunt.
21     Q. Okay. So in this case you've identified some
22 statements that Rinaldo Hunt made prior to making the
23 loan, specifically, that he had some certain balances in
24 their bank account already, that he had deals in the
25 works that would pay him later in 2017, and that he had

Page 27

1  been a successful real estate developer in the past.
2          Are there other statements that you're saying
3  he made prior to making the loan that you relied on
4  besides those three things?
5      A. Absolutely. I mean, he made a lot of -- a lot
6  of verbal misrepresentations and false statements that
7  were very, very consistent with the written
8  misrepresentations, that you already have, that this was
9  a bridge loan for optics, that he had an asset, and he
10 could afford the loan on his own, it was solely a
11 capital issue, he just needed to liquidate whatever
12 assets he needed, but he couldn't do it in time. So as
13 consistent with all the written documentation that this
14 was a timing of cash flow issue and he just needed to
15 show it in his checking account as a bridge loan, and
16 that he would have the money back to me after the close
17 of the Irvine home.
18     Q. Any other misrepresentations?
19     A. I believe that's a lot of mis -- yes, he
20 misrepresented his income, which I have in email. He
21 misrepresented how much he could afford. He was picking
22 up large tabs all the time. He picked up an almost 4-
23 to $500 tab for lunch and drinks at the pool bar in
24 Arizona. He continually took luxury vacations, which,
25 you know, showed that he was a man of comparable

Page 28

1  financial security. I remember Thanksgiving of 2016 he
2  rented a large villa on The Big Island of Hawaii for two
3  weeks, bought his whole family first-class tickets.
4          So he definitely misrepresented himself, his
5  financial security, what he was going to do with my
6  money, what money he had, and, you know, the house that
7  he could afford. So I believe that's actually a lot of
8  misrepresentations and fraudulent statements.
9      Q. Would you agree with me that all of those
10 misrepresentations you just listed deal with his
11 financial situation?
12     A. No. They also -- they are his financial
13 situation, but also what he was going to do with my
14 funds, what he was -- needed my funds for, and when he
15 would pay me back.
16     Q. And don't those things also deal with his
17 financial situation?
18     A. No. If he was in a bad financial situation
19 but could pay us back, he would not make those
20 representations, and he would actually, also, you know,
21 say separate things as well.
22     Q. So a representation about how and when he's
23 going to repay the money is not a financial
24 representation; is that what you're saying?
25     A. I agree. I think they're separate. You have

Page 29

1  a misrepresentation of his financial security, but also
2  a misrepresentation of what he had planned to do
3  fraudulently with my funds. You cannot have good
4  financial security but also plan on misusing funds and
5  using them fraudulently for fraudulent purposes; those
6  are separate regardless of financial security.
7      Q. Okay. Let me change my question a little bit,
8  then. Which of those statements do you believe are not
9  related to Mr. Hunt's present or future financial
10 condition?
11     A. I don't understand the question, I'm sorry.
12     Q. Okay. You've just listed a bunch of
13 representations that you believe were false. Which of
14 those representations that you've listed were not
15 related to the present or future financial condition of
16 Mr. Hunt?
17     A. What he was going to use the funds for.
18     Q. Isn't that by definition something that is in
19 his financial condition?
20         MR. EGAN: Objection. Hang on. Objection,
21 argumentative, and calls for a legal conclusion.
22         Go ahead and answer to the best extent you
23 can.
24         THE WITNESS: Sure. I mean, I think it's
25 separate because someone with not good financial

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 53 of 59

Dennis Lin
January 19, 2021

Page 30

1  security could have the right intent, but I believe he
2  did not -- regardless of his financial security his --
3  he defrauded us in terms of his intent of using the
4  funds.
5      Q. (BY MR. CHRISTENSEN) So at the time that
6  Mr. Hunt said what he needed the funds for, you believe
7  at that time he was intending to not use the funds for
8  that?
9      A. Yes.
10     Q. And what evidence do you have of that?
11     A. I think there -- I'll defer to my lawyer and
12  legal counsel on this, but I think we have lots of
13  written evidence that show that he did not -- never had
14  the intent to pay it back. And he had several
15  opportunities to, and he never did. Even when he sold
16  his house in Irvine he did not pay us back. He had the
17  money at that time, he had the financial security, and
18  he couldn't pay us back. So that shows, I believe,
19  intent that he never intended, no matter his liquidity
20  situation, ever to pay us back.
21     Q. So something that occurred almost two years
22  after the loan had been made you're using to show the
23  intent at the time the loan was made?
24     A. Legal strategy is not my purview. This is --
25  the filings and legal jargon I leave up to my legal

Page 31

1  counsel.
2      Q. Okay. But the evidence in the case is up to
3  you. Your counsel doesn't manufacture evidence, he's
4  stuck with what there is. I don't get to depose
5  Mr. Egan, I get to depose you.
6      So I'm asking you: What evidence do you have
7  of the intent at the time the statement was made that it
8  was false?
9      MR. EGAN: Asked and answered and
10  argumentative.
11     Go ahead.
12     Q. (BY MR. CHRISTENSEN) Go ahead and answer.
13     A. I had no evidence. He had fooled -- clearly
14  fooled me over the last 18 months with his
15  misrepresentations of his financial security and his
16  intent that I was completely fooled by this -- this man.
17     Q. Okay. But I understand you to say you don't
18  have evidence that at the time the loan was made his
19  intent was to misrepresent something to you; is that
20  correct?
21     MR. EGAN: Objection. That's not what he's
22  saying, Matt. And this line of questioning is argue --
23  is problematic because you're asking the witness to
24  opine about what legal evidence is. And so I'm
25  objecting to the question of asking the witness to

Page 32

1  summarize the legal import of what he thinks the
2  evidence is. I'll leave it at that.
3      Q. (BY MR. CHRISTENSEN) Do you want me to repeat
4  the question, or can you remember what it was?
5      A. You can repeat the question.
6      Q. What evidence do you have that at the time the
7  loan was made statements that Mr. Hunt made were
8  intentionally misrepresenting?
9      MR. EGAN: Asked and answered and
10  argumentative and calls for a legal conclusion.
11     Q. (BY MR. CHRISTENSEN) Go ahead and answer.
12     A. At the time --
13     Q. Yes.
14     A. -- we had no evidence that he was lying --
15     Q. Okay.
16     A. -- but we do now.
17     Q. Did Maile ever make any statements to you
18  prior to the loan being made related to the loan?
19     A. I'm sure she did. I don't remember any
20  specifics, but they were in line with everything that
21  Rinaldo has said. She has not said anything. And she
22  has been in the room with us.
23     Q. Is there anything in writing that Ms. Hunt
24  said?
25     A. We potentially have, I believe a text message

Page 33

1  from her pleading for some help on the bridge loan
2  because of some sort of RFP or where she had said some
3  deal had fell through.
4      Q. Do you believe that deal hadn't fell through?
5      A. I did not know.
6      Q. Okay. So were there any misrepresentations by
7  Mrs. Hunt prior to the loan being made?
8      A. Yes. I think that she played the part
9  perfectly in terms of their 18-month mountain of lies in
10  terms of representing their comparable financial
11  security, including what Rinaldo made consistently, they
12  said, every year, and that -- what they could afford.
13  And that's -- was very in line with not just what they
14  had spoken about, written about, and their actions. We
15  did not know they were living beyond their means.
16     Q. In this case, have you identified any written
17  statements from Maile Hunt that you claim were
18  misrepresentations?
19     A. I do not believe so.
20     Q. Okay.
21     A. Conversations were mostly with Rinaldo in
22  terms of the written evidence.
23     Q. There's no promissory agreement for -- or
24  promissory note for this loan, right?
25     A. I wouldn't even know what that is.

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 54 of 59

Dennis Lin
January 19, 2021

Page 34

1    Q.  Any written documentation of the loan other
2    than the wire transfer?
3    A.  Yes.  There's texts --
4    Q.  In the texts and emails that you've sent?
5    A.  I believe that is the written evidence that we
6    have which we got in summary judgment on, so that --
7    Q.  There's no -- there's no written loan
8    agreement, right?
9    A.  Yes, that is correct.  As I've explained
10   before, I'm not a consumer loan --
11   Q.  Okay.  There's no agreement on interest for
12   the loan, right?
13   A.  Correct.
14   Q.  No agreement on time period for repaying --
15   A.  There is.
16   Q.  -- other than maybe shortly after the closing
17   of the Irvine property?
18   A.  Nope.  There is 60 days to season the fund --
19   and he reiterated it in emails -- 60 days that he would
20   season the funds for optics.
21   Q.  Okay.  There's no collateral for the loan,
22   right?
23   A.  No.  We believed that he was a man of
24   comparable financial security, and he was a very
25   successful wealthy developer, and he misrepresented his

Page 35

1    assets.
2    Q.  Okay.  And, I mean, in essence, a loan between
3    friends that's supposed to be repaid, right?
4    A.  Yes.  It was a bridge loan, for optics, that
5    should have been repaid.
6    Q.  There was no extension of a repayment period,
7    right?
8    A.  There was not.  Immediately after the close we
9    had contacted them immediately for repayment.
10   Q.  There was no renewal of a --
11   A.  There's no --
12   Q.  -- loan payment period or refinance of the
13   loan or anything like that, right?
14   A.  No.
15   Q.  It was just a single loan that was supposed to
16   be repaid?
17   A.  Correct.
18   Q.  In the Utah case the claims you made in that
19   case were -- and I'm talking about the Utah case
20   where -- that you filed against the Hunts.  Do you
21   understand that's what I mean when I say "the Utah
22   case"?
23   A.  Yes.
24   Q.  Okay.  In that case your claims against the
25   Hunts were based on breach of contract, correct?

Page 36

1    A.  I don't know what our legal strategy was, but
2    I left the filings and legal strategy up to my legal
3    counsel, Sean Egan.
4    Q.  You did not allege a fraud or
5    misrepresentation claim in that case, correct?
6    A.  I -- I don't know the filings and legal
7    strategy, I left it up to Sean Egan, my legal counsel.
8    Q.  Okay.  But you were the party in that case,
9    right?
10   A.  Yes.
11   Q.  Did you read the complaint in that case before
12   it was filed?
13   A.  I -- I think I did, but I -- like I said, I
14   don't -- I left every single strategy piece and the
15   filing up to my lawyer.
16   Q.  Okay.  So you're saying you don't know what
17   claims you alleged in that case?
18   A.  I don't recall exactly what the claims were,
19   but I think it's irrelevant to what we are talking about
20   today, which is that Rinaldo and Maile Hunt relied on
21   misrepresentations, made fraudulent statements to secure
22   a loan on fraudulent terms.
23   Q.  If the fraud and the misrepresentation are so
24   important, why wasn't that a claim you made in the Utah
25   case?

Page 37

1    A.  That is probably a question for my lawyer in
2    terms of legal strategy.
3    Q.  Okay.  But, again, I can't ask Mr. Egan
4    questions.  If I did he would tell me he's not going to
5    answer.
6    A.  Okay.
7    Q.  So I'm asking you:  Why was that not a claim
8    made in the Utah case?
9    MR. EGAN:  Objection; asked and answered and
10   argumentative.  And also, to the extent that it might
11   invade the privilege, I would instruct the witness not
12   to answer.
13   But if you can answer without disclosing
14   anything that I said to you, go ahead if you can.  It's
15   been asked and answered a couple of times now.
16   THE WITNESS:  Sure.
17   Q.  (BY MR. CHRISTENSEN)  Well, the answer has
18   always been I don't know; I relied on my counsel.  Is
19   that why no claim was made in the Utah case?  Without
20   telling me what Mr. Egan said.
21   A.  I do not know the legal strategy and filing
22   strategy that my legal counsel has come up with for that
23   summary judgment.
24   Q.  Would you agree with me that the judgment in
25   that case is a judgment on a breach of contract claim?

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 55 of 59

Dennis Lin
January 19, 2021

Page 38

1    A.  I cannot recall the exact details of that
2    case, it was a couple years ago.
3    Q.  One of the representations that you allege
4    Mr. Hunt made was related to the balance in his bank
5    account.  Do you recall that?
6    A.  I do not.
7    Q.  In your complaint you identify as a
8    misrepresentation Mr. Hunt's statement that the bank
9    account was going to hold approximately 110,000.
10    Do you recall that allegation from the
11    complaint in this matter?
12    A.  I do not.  But I don't see how this is
13    relevant as this is a cherry-picking, a small part of a
14    much larger issue of misrepresentation throughout.  I
15    think that's a strong line argument in order to chose
16    one specific number out of reams and reams of documents
17    that point to misrepresentation of fraud by Mr. Hunt.
18    Q.  Okay.  But you understand, don't you, that
19    you're the plaintiff that has to show what
20    misrepresentations were made.  Do you understand that?
21    A.  Yes.
22    Q.  Okay.  And so you have to identify specific
23    representations, and so me pointing to one shouldn't be
24    a surprise.
25    Do you recall alleging in the complaint that

Page 39

1    Mr. Hunt misrepresented that he would have 110,000 in
2    his bank account?
3    MR. EGAN:  Let me object on the grounds that
4    the complaint speaks for itself.  And I think there was
5    more to the allegation than what you have characterized
6    here.
7    You can go ahead and answer, Dennis, as best
8    you can.
9    THE WITNESS:  Oh, sorry.  Yes.  I -- I don't
10    recall exactly all the different legal filings, but I
11    believe that the $110,000 was most likely part of one of
12    the filings that Sean has filed.
13    Q.  (BY MR. CHRISTENSEN)  Okay.  And you've seen
14    the bank account statements from Mr. Hunt at this point,
15    correct?
16    A.  I have not, but my lawyer has, Sean Egan.  I
17    personally have not.
18    Q.  Do you have any reason to dispute that the
19    balance in the bank account on the day you made the loan
20    was approximately $107,000?
21    A.  I personally do not have anything to dispute
22    that, but I think that it is cherry-picking out of a
23    much larger set of misrepresentations.  And relying on
24    one thing -- that one number -- cherry-picking one
25    number out of a large number of misrepresentations and

Page 40

1    saying this is correct does not make every
2    misrepresentation correct, that's illogical.
3    Q.  Okay.  So I'm understanding your answer as you
4    don't dispute that there was 107,000 in the bank
5    account?
6    A.  I have no reason to dispute that.
7    Q.  No reason to -- I couldn't understand, sorry.
8    A.  I have no reason to dispute that.
9    Q.  Okay.  And at this point you've seen the Mill
10    Creek documents that dealt with the Mill Creek project
11    that Mr. Hunt was involved in, correct?
12    A.  I have not.
13    Q.  I believe they were presented at Mr. Hunt's
14    deposition last week that you --
15    A.  I was not --
16    Q.  -- participated in.
17    COURT REPORTER:  Whoa.  You two were talking
18    at the same time.
19    So, sorry, Matt, can you start that again?
20    Q.  (BY MR. CHRISTENSEN)  Were you present at
21    Mr. Hunt's deposition last week?
22    A.  I was not.
23    Q.  Have you reviewed the documents that were
24    attached to the summary judgment motion filed last year?
25    A.  I believe I reviewed them, yes.

Page 41

1    Q.  Okay.  So you've seen the Mill Creek documents
2    that were associated with the project that Mr. Hunt was
3    involved in, in 2017, correct?
4    A.  Yes.
5    Q.  And would you dispute that had that project
6    closed in 2017, Mr. Hunt would have received a
7    commission of approximately $165,000?
8    MR. EGAN:  Objection; foundation, speculation,
9    and does not accurately portray the document itself.
10    Q.  (BY MR. CHRISTENSEN)  Go ahead and answer.
11    A.  Yes.  I did not rely on those representations.
12    The first time I heard of Mill Creek was far, far after
13    this loan.  We did not count on this loan -- or,
14    sorry -- this deal that we did did not even have any
15    knowledge of.  The only representations that were made
16    to us that were false was our -- that our bridge -- our
17    loan was for a bridge loan for optics, the majority of
18    the money would be dealt after the close, and this was
19    not reliant, whatsoever, on any deals closing.  This was
20    a man of comparable financial security that made a lot
21    of money here, he just needed a bridge loan for a couple
22    months to show optics to the bank.  Our loan did not
23    rely, whatsoever, on any deals that he was closing
24    anytime in 2017.  So that was irrelevant in terms of
25    giving our loan.

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 56 of 59

Dennis Lin
January 19, 2021

Page 42

1    He may have mentioned it that there were two
2  deals closing early in 2-4, for additional comfort
3  that -- you know, for our loan, and then he reassured me
4  that I'm going to get my money back very quickly, and it
5  was a short-term liquidate issue.  But we did not rely
6  on any deals nor was our loan contingent on any deals
7  that he was closing.  He was a very rich man that had
8  this -- had the money, and he just needed short-term
9  liquidating cash in his checking account.
10   Q.  And that's what you were relying on in making
11  the loan, was that Mr. Hunt was a successful real estate
12  developer that had a comfortable life; is that correct?
13   A.  Well, he misrepresented every part of his
14  life, yes.  He misrepresented his income, he
15  misrepresented his assets, he misrepresented what he was
16  using our money for, he misrepresented everything
17  within -- to -- in order to con us out of money.
18   Q.  And, again, I'm sorry if you've answered this
19  already:  When did he misrepresent his income?
20   A.  For the complete timeline that we've known
21  him, from the very start, including emails from him
22  personally saying that he makes 5- to $600,000 a year,
23  and this is over -- over a year before we even made the
24  loan, and that he wasn't willing to take a pay cut, and
25  that he -- this is what he makes and has made

Page 43

1  consistently.
2   Q.  Okay.  And when did he misrepresent assets?
3   A.  Throughout his -- the time we've known him.
4   Q.  Did any of those misrepresentations come
5  between the time when the loan started being discussed
6  and the loan was made?
7   A.  Yes.
8   Q.  What were the representations between those
9  two time periods regarding income?
10   A.  Regarding income?
11   Q.  Yeah.
12   A.  That he made -- that he consistently made a
13  large amount of money a year, over -- over half a
14  million dollars a year, he had lots of deals going on.
15  He consistently talked about deals which I don't know
16  ever were real or not.  He had brought up deals such
17  as --
18   Q.  I'm going to pause you here real quick.  I'm
19  talking the time period of April 2017, when you had the
20  conversation in Arizona, and July of 2017, when the loan
21  was made.  What specific representations did Mr. Hunt
22  make about his income?
23   A.  His representations were that he made a lot of
24  money, and he had continual capital coming in from
25  deals.

Page 44

1   Q.  Those were representations that he said or
2  that he wrote?  I couldn't hear you.
3   A.  That he said.
4   Q.  Okay.  And between April of 2017 and July of
5  2017 what representations were made regarding the Hunts'
6  assets?
7   A.  That he had plenty of assets, a lot of
8  illiquid assets, that he had the means to purchase his
9  home, and that he just needed cash in his checking
10  account in order to satisfy loan optics and to ensure
11  that he did not endure additional underwriting from any
12  potential underwriters.
13   Q.  And were those statements something that
14  Mr. Hunt said or wrote?
15   A.  Said, wrote, obviously, in previous emails,
16  and his lifestyle and the way -- his actions.
17   Q.  And when you say "his lifestyle" and
18  "actions," are you saying his lifestyle was a
19  misrepresentation to you?
20   A.  I believe so.
21   Q.  And there's nothing about his lifestyle that
22  would be in writing, correct?
23   A.  We could probably look at his credit card
24  bills from April and see that he had very large dinner
25  and lunch tabs that he was picking up that he probably

Page 45

1  couldn't afford.
2    MR. EGAN:  Matt, do you have any objection to
3  a break?
4    MR. CHRISTENSEN:  No.  Let's take five
5  minutes.  Is that all right?
6    MR. EGAN:  Yeah.  It's just a coffee/water
7  break for me.
8    MR. CHRISTENSEN:  All right.
9    (Recess.)
10    MR. CHRISTENSEN:  Back on the record.
11   Q.  (BY MR. CHRISTENSEN)  Mr. Lin, I want to go
12  back to one of the -- when we were discussing your job
13  history.  When you were working for Credit Suisse you
14  said you left as the global head of interest rate swap
15  trading for U.S. dollars.  Can you just describe for me
16  what interest rate swap trading is?
17   A.  Yes.  They're contracts that are -- where the
18  underlying security is LIBOR, which is an interest rate
19  fixate.
20   Q.  And what does the swap trading do?
21   A.  It manages liquidity for customers.  It is a
22  vehicle for managing a company's interest rate risk.
23   Q.  Okay.  Who is doing the swapping?  I guess who
24  are the parties involved?
25   A.  Large institutions and banks.

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 57 of 59

Dennis Lin
January 19, 2021

Page 46

1    Q. Okay. And is there -- I assume there's some
2  kind of swap contract between the institutions and the
3  banks?
4    A. It's done electronically.
5    Q. What do you mean it's done electronically?
6    A. There are no written, usually, confirmations
7  within that product -- it's a liquid product that trades
8  electronically.
9    Q. So the trades are done electronically, but
10  would there be a contract between the institution and
11  the company that describes how often the trades will be
12  done, what the swap terms are, that sort of thing?
13    A. That's all done in the back office, not within
14  the front office.
15    Q. Okay. Did you ever work in the back office?
16    A. Never.
17    Q. What did you do with swap trading before
18  becoming the head of that department?
19    A. I worked within the desk, always the front
20  office.
21    Q. The funds for the loan to the Hunts came from
22  your business; is that correct?
23    A. From my -- from my funds, came from my
24  business account because it's my account.
25    Q. Okay. Does your wife have an interest in the

Page 47

1  business as well?
2    A. She does not.
3    Q. Is she a partner?
4    A. She is not.
5    Q. She is not? Okay.
6      Okay. Unless Sean has questions, I think I'm
7  done.
8      MR. EGAN: I have a couple.
9
10
11           EXAMINATION
12  QUESTIONS BY MR. EGAN:
13    Q. Mr. Lin, when you advanced money and made the
14  transfer to Rinaldo Hunt, did you have any expectation
15  that Maile Hunt would benefit from that as well?
16    A. Of course, they are a family unit.
17    Q. Okay. You have made reference to some text
18  messages that Mr. Hunt sent to you or text exchanges the
19  two of you had in early June 2017. We didn't see any of
20  them here.
21      Do you recall a representation made by
22  Mr. Hunt that he had two deals closing in the early
23  fourth quarter of 2017?
24    A. Absolutely, at that time --
25    Q. Let me stop you there. Can you tell me in

Page 48

1  what way, if any, you relied on those representations in
2  that text message?
3    A. Yes. We definitely relied on the
4  misrepresentation.
5    Q. In what way? In what way?
6    A. It was meant to assure me that we were going
7  to have money back quickly and timely and within that
8  60-day guideline -- or 60-day agreement for the loan --
9  for the bridge loan for optics.
10    Q. Do you recall how many deals Mr. Hunt
11  represented to you he had closing in the fourth quarter
12  of 2017?
13    A. Yes. The text message said clearly that he
14  had two deals closing in early of 2-4.
15    Q. Okay.
16    A. Which, obviously, was very reassuring to me.
17    Q. In what way was it reassuring?
18    A. Because it made sure that I was going to get
19  my money back on a timely basis within that timeframe
20  that was agreed upon.
21    Q. Okay. Now, Mr. Christensen asked you some
22  questions about the -- I think it was the Mill Creek
23  deal. And I understood from your answer -- tell me if
24  I'm wrong -- that you didn't actually look at that
25  documentation?

Page 49

1    A. I did not.
2    Q. Did Mr. Hunt ever speak to you specifically
3  about the Mill Creek deal prior to July 12th?
4    A. He did not.
5    Q. And did Mr. Hunt ever identify the other deal
6  that he was referred --
7    A. He did not.
8    Q. You've got to let me finish.
9      Did he ever tell you what the other deal was
10  that he referred to in his June 4th text message to you?
11    A. He did not.
12    Q. Okay. I think that's all I have. Thank you,
13  Mr. Lin.
14    A. Thank you.
15      MR. CHRISTENSEN: I have some followup
16  questions based on that.
17
18      FURTHER EXAMINATION
19  QUESTIONS BY MR. CHRISTENSEN:
20    Q. The representation about the two deals closing
21  that was in the text message, are you saying you did
22  rely on that statement in making the loan?
23    A. Oh, absolutely. Because additional comfort
24  that I was going to get my money back. I'm sorry if I
25  wasn't clear.

In Re: Rinaldo and Maile Hunt

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 58 of 59

Dennis Lin
January 19, 2021

Page 50

1    Q. Okay.
2    A. But it was definitely meant to assure me that
3  I was going to get my money back within the agreed-upon
4  timeframe. So I definitely counted on that
5  misrepresentation, you know, to give the loan.
6    Q. What's the basis for you saying it was a
7  misrepresentation that Mr. Hunt would have two deals
8  closing in the fourth quarter?
9    A. I think at that time he did not have two deals
10  that he knew were going to close in early 2-4.
11    Q. And what's the basis for that statement?
12    A. I don't think that my -- my legal counsel told
13  me that he did not have any sort of deals closing in
14  early 2-4 that he knew at that time.
15    Q. Okay. Did you ever ask Mr. Hunt prior to
16  making the loan, "What are these two deals"?
17    A. No. I trusted his misrepresentation that he
18  had these two deals after the closing in early 2-4.
19    Q. So I'm having trouble with the words that you
20  just used. You "trusted his misrepresentation"?
21    A. Yes.
22    Q. At the time you didn't believe it was a
23  misrepresentation, though, correct?
24    A. Yes, I did not believe --
25    Q. It was a true statement by Mr. Hunt?

Page 51

1    A. Yes. That's generally what misrepresentation
2  is.
3    Q. Well, that's what a representation is. A
4  misrepresentation is a false statement.
5    A. Correct.
6    Q. At the time you did not believe it was a false
7  statement by Mr. Hunt, right?
8    A. Yes. Which is why I --
9    Q. You thought it was correct?
10    A. Correct, which is why I gave the loan.
11    Q. Okay. What evidence do you have that that
12  statement was incorrect when it was made?
13    A. My legal counsel told me that --
14    MR. EGAN: Whoa, whoa, whoa, Dennis.
15    Q. (BY MR. CHRISTENSEN) Yeah, I don't want to
16  hear what he told you --
17    MR. EGAN: Right.
18    Q. (BY MR. CHRISTENSEN) -- that's privileged
19  stuff, and so I -- and plus I don't care what Mr. Egan
20  knows, I'm looking at what you know.
21    MR. EGAN: Just tell him --
22    THE WITNESS: Yes.
23    MR. EGAN: The question was what evidence do
24  you have. And so what I'm asking -- what I think he's
25  asking you to do is tell him to your best ability what

Page 52

1  you think the evidence is to answer the rest of that
2  question -- which I forgot, I'm sorry Matt.
3    Q. (BY MR. CHRISTENSEN) So the question was:
4  What evidence do you have that that statement regarding
5  two deals closing in the fourth quarter of 2017 was
6  false --
7    A. I believe --
8    Q. Let me finish the question -- at the time the
9  statement was made?
10    A. At the time the statement was made, I do not
11  believe he had the Mill Creek deal even on paper. Mill
12  Creek did not exist even when he said that there are two
13  deals closing early 2-4. So he made that statement even
14  before any sort of documentation was provided or any
15  sort of deal was entered into.
16    Q. And that's with regard to the Mill Creek deal.
17  What about the second deal that was mentioned?
18    A. I have -- yeah, he has failed to provide any
19  sort of documentation on any sort of deal that he had
20  closing in early 2-4 that was going to provide him with
21  any income.
22    Q. So the evidence that you have that there
23  wasn't a second deal in place is that Rinaldo hasn't
24  shown that there was a second deal in place. Is that --
25  am I understanding you correctly?

Page 53

1    A. Correct. And he also -- he's -- nothing ever
2  closed. Mill Creek was something that he had mentioned
3  afterward, which wasn't even in -- in contract at the
4  time that he had made the false statements about, you
5  know, closing in 2-4, so, obviously --
6    Q. What was the --
7    A. -- there was no contract.
8    Q. I'm sorry.
9    A. Sorry. There was no contract.
10    MR. CHRISTENSEN: Did you get that, Molly?
11    COURT REPORTER: He said, "There was no
12  contract."
13    Q. (BY MR. CHRISTENSEN) Do you recall the date
14  of that text?
15    A. I believe it was early June.
16    Q. Okay. I don't have anything more.
17    MR. EGAN: Nothing from me. We'll read and
18  sign.
19    COURT REPORTER: Are you purchasing a copy?
20    MR. EGAN: Yes.
21    (Deposition concluded at 10:28 a.m.)
22    (Signature requested.)
23
24
25

Case 20-06015-JDP    Doc 38-4    Filed 03/03/21    Entered 03/03/21 15:27:40    Desc
Declaration of Matthew T. Christensen    Page 59 of 59

In Re: Rinaldo and Maile Hunt

Dennis Lin
January 19, 2021

Page 54

## CERTIFICATE OF WITNESS

1                CERTIFICATE OF WITNESS
2      I, DENNIS LIN, being first duly sworn, depose and
3 say:
4      That I am the witness named in the foregoing
5 deposition, consisting of pages 1 through 53; that I
6 have read said deposition and know the contents thereof;
7 that the questions contained therein were propounded to
8 me; and that the answers contained therein are true and
9 correct, except for any changes that I may have listed
10 on the Change Sheet attached hereto.
11      DATED this _____ day of _____, 2021.
12
13     _____
14      DENNIS LIN
15 SUBSCRIBED AND SWORN to before me this ____ day of
16 _____, 2021.
17
18
19     _____
20      NAME OF NOTARY PUBLIC
21
22
23      NOTARY PUBLIC FOR _____
24      RESIDING AT _____
25      MY COMMISSION EXPIRES _____

---

1            CHANGE SHEET FOR DENNIS LIN
2 Page___ Line ___ Reason for Change _____
   Reads___
3 Should Read _____
4 Page___ Line ___ Reason for Change _____
   Reads___
5 Should Read _____
6 Page___ Line ___ Reason for Change _____
   Reads___
7 Should Read _____
8 Page___ Line ___ Reason for Change _____
   Reads___
9 Should Read _____
10 Page___ Line ___ Reason for Change _____
   Reads___
11 Should Read _____
12 Page___ Line ___ Reason for Change _____
   Reads___
13 Should Read _____
14 Page___ Line ___ Reason for Change _____
   Reads___
15 Should Read _____
16 Page___ Line ___ Reason for Change _____
   Reads___
17 Should Read _____
18 Page___ Line ___ Reason for Change _____
   Reads___
19 Should Read _____
20 Page___ Line ___ Reason for Change _____
   Reads___
21 Should Read _____
22 Page___ Line ___ Reason for Change _____
   Reads___
23 Should Read _____
24 Use a separate sheet if you need more room.
25 WITNESS SIGNATURE _____

---

## REPORTER'S CERTIFICATE

1              REPORTER'S CERTIFICATE
2      I, MARLENE "MOLLY" WARD, CSR No. 704,
3 Registered Professional Reporter, certify:
4      That the foregoing proceedings were taken
5 before me at the time and place therein set forth, at
6 which time the witness was put under oath by me;
7      That the testimony and all objections made
8 were recorded stenographically by me and transcribed by
9 me or under my direction;
10      That the foregoing is a true and correct
11 record of all testimony given, to the best of my
12 ability;
13      I further certify that I am not a relative or
14 employee of any attorney or party, nor am I financially
15 interested in the action.
16      IN WITNESS WHEREOF, I set my hand and seal
17 this 27th day of  January  , 2021.
18
19
20     _____
21      MARLENE "MOLLY" WARD, CSR, RPR
22      Notary Public
23      P.O. Box 2636
24      Boise, Idaho  83701-2636
25 My Commission expires July 11, 2026